[No. A129695. First Dist., Div. One. May 21, 2012.]

BRIAN BRANNAN et al., Plaintiffs and Appellants, v.
LATHROP CONSTRUCTION ASSOCIATES, INC., Defendant and
Respondent.

COUNSEL

Rouda Feder Tietjen & McGuinn and Miles B. Cooper for Plaintiff and Appellant.

Jenkins Goodman Neuman & Hamilton, Joshua S. Goodman and Zachary S. Tolson for Defendant and Respondent.

OPINION

**MARGULIES, J.**—While working for a masonry subcontractor at a school construction site, Brian Brannan slipped on wet scaffolding and injured his back. He sued the general contractor, Lathrop Construction Associates, Inc. (Lathrop), alleging his injuries were caused by Lathrop's negligence in

sequencing and coordinating construction work at the site, and failing to call a "rain day" to protect workers from dangerous conditions caused by slippery surfaces. Lathrop moved successfully for summary judgment under the *Privette-Toland* doctrine. (*Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (*Privette*); *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504] (*Toland*).) Brannan contends the trial court erred in finding there were no triable issues of material fact. We affirm.

## I. INTRODUCTION

### A. *Pleadings*

Brannan filed a complaint on October 29, 2008, alleging Lathrop was actively negligent in failing to carry out its duties of care as the general contractor on a construction project at El Cerrito High School. He alleged Lathrop's negligence caused him to suffer personal injury when he slipped on wet scaffolding and injured his back while working at the site as a journeyman bricklayer employed by a masonry subcontractor.

Brannan pled causes of action for negligence and premises liability. His negligence cause of action alleged, among other things, Lathrop failed to coordinate and control the work being performed on the jobsite in a safe and proper manner, thereby creating a risk of injury to workers. Brannan alleged he was forced to work in and around scaffolding that prevented and blocked his access to his work, causing him to fall. Brannan's premises liability claim was based on essentially the same facts.

### B. *Summary Judgment Motion*

By motion for summary judgment, Lathrop asserted it was entitled to judgment as a matter of law under the *Privette-Toland* line of cases, based in substance on the following undisputed facts: Brannan was employed by Bratton Masonry (Bratton) as a journeyman bricklayer and was working at the El Cerrito High School construction site at the time of the accident. Lathrop was the general contractor. Lathrop hired Bratton as a subcontractor to perform masonry work at the site. Bratton's subcontract required it to "comply with all State and Federal Health and Safety requirements," as well as Bratton's and Lathrop's safety procedures and to "maintain a safety program" on the site. Lathrop also hired M. Perez Company, Inc., doing business as Henley & Company (Henley), as a subcontractor to perform plaster work. Henley's subcontract required Henley to "comply with all State and Federal Health and Safety requirements," as well as Bratton's and Lathrop's safety procedures, and to maintain a safety program at the site.

Tom Kennon was Lathrop's onsite project manager at the time of the accident, and was in charge of managing safety on the site for Lathrop. Lathrop had the final say on coordination of the work at the site and had authority to stop a subcontractor's work for a safety issue. Before beginning the project, Kennon discussed sequencing with Bratton and Henley. It was discussed at the meeting Henley would do the plastering first, and remove the plaster scaffold before Bratton started the masonry work. There was agreement Bratton would not use Henley's plaster scaffold. However, when Henley completed its plastering work, Henley left a section of plaster scaffolding up at the request of framer Advanced Interiors (AI) so AI could finish framing on a bridge between buildings C and D. Henley's foreman believed he told Kennon that Henley was leaving the plaster scaffold for AI to use, and Kennon agreed to this. Bratton never requested Henley to remove the plaster scaffold.

Bratton employees were working at ground level laying brick veneer in the area of the bridge between buildings C and D on the day of the accident. Peter Garcia was the Bratton foreman that day. Part of his job was to make sure the site was safe for Bratton employees. Garcia did not need authority from Lathrop to call off work if he saw something was unsafe. He was aware of the plaster scaffolding in the area where Bratton employees were working. They were not using the scaffolding on the day of the accident, but were working around it. Garcia did not have safety concerns about his workers working around the scaffolding, but he did feel the scaffolding would slow down their work. He asked Lathrop before the accident when the plaster scaffold would be removed. Garcia had the authority to call work off if he believed rain (or any other condition) made conditions unsafe, but had no concerns about the rain or wetness on the day of the accident other than that it slowed down the work. Garcia believed his crews could work around the plaster scaffold, and had no safety concerns about them stepping onto the scaffold rungs to get to the other side. Lathrop did not direct Garcia or Brannan on how the masonry was to be laid.

At the time of the accident, Brannan was trying to cross over the plaster scaffold to gain access so he could lay masonry in an area underneath it. Brannan alleges he stepped up onto the second rung of the scaffold believing there was no other way to access the area in which he was working. No one told Brannan to gain access the way he did. Brannan alleges he slipped off the rung because it was wet and his feet were muddy. He filed a workers' compensation claim shortly after the accident.

The trial court granted summary judgment to Lathrop, and this appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

On appeal after a trial court has granted summary judgment, we review the record de novo to determine whether the evidence submitted for and against the motion discloses material factual issues warranting a trial. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334–335 & fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

Summary judgment is properly granted when no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment bears the initial burden of showing a cause of action has no merit by showing one or more of its elements cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subds. (a), (o).) Once the defendant has met that burden, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.)

### B. *The* Privette-Toland *Doctrine*

■ Our Supreme Court recently summarized the *Privette-Toland* doctrine as follows: "Generally, when employees of independent contractors are injured in the workplace, they cannot sue the party that hired the contractor to do the work. . . . [¶] By hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes to the contractor's employees to ensure the safety of the specific workplace that is the subject of the contract." (*SeaBright Ins. Co. v. U.S. Airways, Inc.* (2011) 52 Cal.4th 590, 594 [129 Cal.Rptr.3d 601, 258 P.3d 737], italics omitted.) One of the doctrine's underpinnings is the availability of workers' compensation to the injured employee: "[W]hen the person injured by negligently performed contracted work is one of the contractor's own employees, the injury is already compensable under the workers' compensation scheme and therefore the [law] should provide no tort remedy, for those same injuries, against the person who hired the independent contractor." (*Privette, supra,* 5 Cal.4th at p. 696.) Because the workers' compensation scheme shields an independent contractor from tort liability to its employees, "applying the peculiar risk

doctrine [allowing suit against the hirer] to the independent contractor's employees would illogically and unfairly subject the hiring person, who did nothing to create the risk that caused the injury, to greater liability than that faced by the independent contractor whose negligence caused the employee's injury." (*Toland, supra,* 18 Cal.4th at p. 256 [summarizing the holding of *Privette*].)

Thus, subject to certain exceptions, when a general contractor hires a subcontractor, the general contractor is not liable for injuries that occur to the subcontractor's employees. (See, e.g., *Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338 [68 Cal.Rptr.3d 177].) The exception in issue here is described in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (*Hooker*).

 In *Hooker,* the court considered whether the hirer of an independent contractor could be held liable for injuries to the contractor's employee resulting from the contractor's negligence under the theory the hirer retained control of the work but negligently exercised that control. The high court held in *Hooker* "a hirer of an independent contractor was not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but was liable to such an employee insofar as its exercise of retained control *affirmatively contributed to the employee's injuries.*" (*Millard v. Biosources, Inc., supra,* 156 Cal.App.4th at p. 1348 [summarizing *Hooker*].) In such cases, the liability of the hirer is not "vicarious" or "derivative" in the sense that it derives from the act or omission of the hired contractor, but is direct. (*Hooker, supra,* 27 Cal.4th at p. 212; see *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 222, 225 [115 Cal.Rptr.2d 868, 38 P.3d 1094] [hirer is directly liable to an employee of an independent contractor when hirer's provision of unsafe equipment affirmatively contributes to the employee's injury].)

In *Hooker,* the widow of a deceased crane operator who had been employed by a general contractor hired by the Department of Transportation (Caltrans) to construct an overpass, sued Caltrans for negligently exercising its retained control over jobsite safety. (*Hooker, supra,* 27 Cal.4th at p. 202.) The Caltrans construction manual provided Caltrans was responsible for obtaining the contractor's compliance with all safety laws and regulations, and Caltrans's onsite engineer had the power to shut the project down because of safety conditions and to remove employees of the contractor for failing to comply with safety regulations. (*Id.* at pp. 202–203.) The plaintiff's husband died after the crane tipped over when he attempted to operate it without reextending the crane's outriggers. (*Id.* at p. 202.) He had retracted the outriggers in order to allow Caltrans vehicles and other construction vehicles to use the narrow overpass. (*Id.* at p. 214.) The plaintiff alleged

Caltrans was negligent in permitting this traffic to use the overpass while the crane was being operated. (*Id.* at pp. 202, 214–215.)

■ Although the court found the plaintiff in *Hooker* had raised triable issues of material fact as to whether Caltrans retained control over safety conditions at the worksite, she failed to raise triable issues of material fact as to whether Caltrans actually exercised its retained control so as to affirmatively contribute to the death of her husband. (*Hooker, supra,* 27 Cal.4th at p. 202.) The court stated: " '[A] general contractor owes no duty of care to an employee of a subcontractor to prevent or correct unsafe procedures or practices to which the contractor did not contribute by direction, induced reliance, or other affirmative conduct. The mere failure to exercise a power to compel the subcontractor to adopt safer procedures does not, without more, violate any duty owed to the plaintiff.' " (*Id.* at p. 209.) Under the standard approved in *Hooker,* a general contractor contributes to an unsafe procedure or practice by its affirmative conduct where the general contractor " 'is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control occurs, for example, when the principal employer directs that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished.' " (*Id.* at p. 215, italics omitted.)

*Hooker* also states an omission may constitute an affirmative contribution in some circumstances: "[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra,* 27 Cal.4th at p. 212, fn. 3.)

Applying these standards to the facts before it, the *Hooker* court held: "While the evidence suggests that the crane tipped over because the crane operator swung the boom while the outriggers were retracted, and that the crane operator had a practice of retracting the outriggers to permit construction traffic to pass the crane on the overpass, *there was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the adoption of that practice by the crane operator. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it.*" (*Hooker, supra,* 27 Cal.4th at p. 215, italics added.)

### C. *Trial Court Decision*

The trial court explained its decision to grant summary judgment to Lathrop as follows: "Defendant has shown that it did not exercise control in a

way that affirmatively contributed to Plaintiff's injuries. [Citation to *Hooker*.] . . . Plaintiffs' evidence shows that Defendant was responsible for coordinating and scheduling the work of subcontractors on the project, that Defendant had the authority to direct that the plastering scaffold be removed, and that it 'agreed' the scaffold could remain at the area where Plaintiff was working. . . . However, this is insufficient to raise any issue of fact as to whether Defendant affirmatively contributed to Plaintiff's injuries."

## D. Analysis of Issues on Appeal

Brannan contends he did raise triable issues of fact as to whether Lathrop's negligent exercise of control over the jobsite affirmatively contributed to his injuries. In particular, he maintains there are fact issues with respect to whether Lathrop negligently scheduled bricklayers to work in an area it knew was obstructed by a scaffold. According to a declaration submitted by Brannan's expert, the presence of the scaffold was hazardous because it required the masons to repetitively climb over and through the scaffold to perform their work, presenting an unnecessary tripping, slipping, and falling hazard. Proximate causation was established because if Lathrop had not (1) scheduled the masons to work before the framers had finished and (2) permitted the scaffold to remain on the jobsite, Brannan would not have been injured. According to Brannan, Lathrop's acts of scheduling the work and permitting the scaffold to remain are "affirmative acts . . . by Lathrop that affirmatively contributed to the incident." Lathrop's contribution to the accident was compounded by the fact it allowed the masonry work to continue despite rain conditions.

We do not agree Lathrop's act of scheduling the work can subject it to liability under *Hooker*. The plaintiff in *Hooker* alleged Caltrans was negligent in permitting its own vehicles and other construction vehicles to use the overpass where the accident occurred while the crane was being operated. (*Hooker, supra*, 27 Cal.4th at pp. 202, 214–215.) There is no material difference between that claim and Brannan's position in this lawsuit. The plaintiff in *Hooker* could have just as easily blamed the accident on Caltrans's negligence in scheduling and coordinating the work being done on the overpass, yet there is no reason to expect the result of the case would have been any different if she had. The critical factor in *Hooker* was that although the crane operator was *required* to repetitively retract the outriggers to permit construction-related traffic to pass, Caltrans *never affirmatively directed him* to engage in that practice nor did it otherwise interfere with the means and methods by which his work was to be accomplished. (*Id.* at pp. 214–215.) Put another way, since Caltrans exercised no control over *how* the crane operator performed his work, it could not be held liable for the accident that resulted. Here, it was undisputed Lathrop did not direct

Brannan's work, and did not tell Brannan to gain access under the plaster scaffold the way he did. Although Brannan contends he was left with no other option than to climb over the rungs of the scaffold, that fact does not distinguish this case from *Hooker*. As stated, the crane operator in *Hooker* was *required* to retract the outriggers to let traffic pass. Lathrop's exercise of retained control over safety conditions no more affirmatively contributed to the accident than Caltrans affirmatively contributed to the crane accident in *Hooker*.

If anything, Caltrans was in a better position to prevent the crane accident than Lathrop was to prevent Brannan's slip and fall. Caltrans knew before the accident occurred the crane operator was retracting the outriggers to let its construction traffic pass, and knew the crane would be unstable if its boom were extended over its side when the outriggers were retracted. (*Hooker*, *supra*, 27 Cal.4th at pp. 202–203, 215.) Here, there was no evidence Lathrop knew before Brannan's fall he or other Bratton employees were climbing over the scaffolding in the manner they did, or that this practice posed a safety hazard. Bratton's own foreman, who did know about the practice and was responsible for the safety of Bratton's employees, stated he had no safety concerns about it.

*Sheeler v. Greystone Homes, Inc.* (2003) 113 Cal.App.4th 908 [6 Cal.Rptr.3d 683] (*Sheeler*) directly addresses the question of whether a general contractor's allegedly negligent scheduling of work to be performed at the jobsite can subject it to liability on the theory its exercise of retained control over safety conditions affirmatively contributed to the injury of a subcontractor's employee. (*Id.* at pp. 919–921.) In *Sheeler*, an employee (Sheeler) of a masonry subcontractor (Greystone) was injured when he slipped on construction debris allegedly left on a stair case by a cleaning subcontractor. (*Id.* at pp. 911, 916.) In response to Greystone's motion for summary judgment under *Privette*, Sheeler contended there were triable issues regarding whether ". . . Greystone retained control over a facet of safety operations, namely, the scheduling of cleanups[, whether] Greystone negligently scheduled a cleanup at the same time that . . . Sheeler was to work in the unit, rather than before he commenced this work[,] and [whether] Greystone's cleanup contractor negligently swept debris onto the stairs, thereby causing . . . Sheeler's injuries." (*Sheeler*, at pp. 919–920.)

The Court of Appeal rejected Sheeler's argument based in part on the fact that even though one purpose of scheduling the cleanups was to enhance safety, the undisputed evidence showed guaranteeing safety was not the *sole* purpose of the scheduling. (*Sheeler*, *supra*, 113 Cal.App.4th at pp. 917–918, 920.) Since Greystone never promised to schedule cleanups to guarantee safety or established a practice of doing so, the court found there was no

triable issue of fact as to whether Greystone was *exercising retained control over safety* when it scheduled the sweeps. (*Id.* at p. 920.) As in *Sheeler*, there is no evidence here the sole or predominant purpose of scheduling the masonry and framing work was to guarantee jobsite safety, and therefore no triable issue of fact as to whether the scheduling constituted a negligent exercise of retained control over safety.

Equally, Lathrop's act of allowing the scaffolding to remain in place while the masonry work proceeded was no more an exercise of retained control over safety than was Caltrans's decision in *Hooker* to allow construction traffic to access the overpass while the crane was being used, or Greystone's decision in *Sheeler* to allow sweeping operations while masonry work was being performed. This would be a different case if Bratton's foreman or one of its employees had asked Lathrop to remove the scaffolding for safety reasons, Lathrop had promised to do so, and then it negligently failed to follow through. (See *Hooker, supra*, 27 Cal.4th at p. 212, fn. 3.) Brannan came forward with no such evidence here.

Lathrop's failure to call a rain day is also unavailing. The undisputed evidence showed Bratton's foreman, Garcia, had the authority to call a rain day himself without Lathrop's approval if he thought the conditions made the masonry work unsafe. Garcia testified he had no concerns about the rain or wetness in the work area the day of the accident other than that it slowed down the work. He did not have any safety concerns about his workers stepping onto the rungs of the scaffold to gain access to where they were working.

*Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 [120 Cal.Rptr.2d 251], cited by Brannan, is distinguishable. In *Ray*, an employee of a bridge construction subcontractor was killed by construction debris blown by the wind from a bridge under construction onto a public roadway, as he was attempting to clear other debris from the roadway. (*Id.* at p. 1124.) The Court of Appeal found there was a triable issue of fact regarding the exercise of retained control over safety, and distinguished *Hooker*, because the general contractor in *Ray* had contractually reserved *exclusive* control over whether to close the roadway in order to protect motorists from potential construction-related hazards, and barred the subcontractor from closing it without the general's written consent. (*Id.* at pp. 1133–1134.) Here, there was no dispute either Bratton or Lathrop could have called a rain day and Bratton's subcontract expressly delegated Lathrop's workplace safety responsibilities to Bratton without reservation. Lathrop's failure to exercise retained control in that circumstance is not a negligent exercise of control. (*Hooker, supra*, 27 Cal.4th at pp. 214–215; *Ruiz v. Herman Weissker, Inc.* (2005) 130 Cal.App.4th 52, 65–67 [29 Cal.Rptr.3d 641].)

Summary judgment was properly granted to Lathrop.

## III. DISPOSITION

The judgment is affirmed.

Marchiano, P. J., and Banke, J., concurred.