Filed 9/16/16  Certified for Publication 9/22/16 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VICTOR M. REGALADO, | D069647 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INC1203669) |
| JEFFREY M. CALLAGHAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, David M. Chapman, Judge.  Affirmed.

Wood, Smith, Henning & Berman, R. Gregory Amundson and Christopher Perez; Greines, Martin, Stein & Richland, Robert A. Olson and Alana H. Rotter, for Defendant and Appellant.

Thon Beck Vanni Callahan & Powell and Daniel P. Powell; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Respondent.

Jeffrey M. Callaghan hired Dunn's Designer Pools (Dunn's), a landscape and pool contractor, to build a pool and spa at his home.  Victor M. Regalado, a Dunn's employee,

suffered injuries when he installed a propane fueled pool heater on Callaghan's property. Regalado sued Callaghan for negligence and premises liability. The jury found Callaghan was negligent and assigned 40 percent of fault to him. After applying the jury's fault allocation and setoffs, the trial court entered judgment against Callaghan in the amount of approximately $3 million.

Callaghan appeals, contending: (1) the court erred by failing to instruct the jury that a person who hires an independent contractor is not liable for injuries to the contractor's employee unless the hirer's negligent exercise of retained control "affirmatively contributed" to the employee's injury, (2) insufficient evidence supported the jury's verdicts on both premises liability and negligence, (3) Regalado's counsel committed misconduct by urging the jury to base its verdict on protecting the community, (4) the trial court erred by permitting Regalado to recover past wages because Dunn's had continued to pay his salary after the accident, and (5) the jury's award of future medical costs must be reduced because it was not supported by substantial evidence. We reject Callaghan's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Callaghan, a licensed concrete subcontractor, wanted to build a dream house for his wife in the Coachella Valley. He decided to act as an owner-builder for his home project. An owner-builder is a property owner that obtains permits for the construction job at his or her own home and serves as the person responsible for the construction, similar to a general contractor. After obtaining a building permit for the house, Callaghan did the concrete work himself and hired licensed subcontractors to complete

2

other work. Callaghan was at the site daily, kept track of progress, and asked his subcontractors whether things were ready so that he could call for inspections.

Callaghan planned to have Richard Clark of Canyon Pools build his pool and spa. In order to minimize noise, Callaghan wanted to have the pool equipment installed in an underground vault, which he had seen at other homes. Clark purchased a pre-engineered vault for Callahan. Clark and Callaghan installed the vault. The vault had a hole on top for entry and exit. Callaghan put a collar on the hole to extend it upward so that the vault could be buried further underground and put a mesh grate over the top of it.

Callaghan's property did not have natural gas service so he hired a plumbing subcontractor, SSW, to run propane lines to the house and backyard. Under SSW's contract, it was not required to obtain permits for its work. Instead, Callaghan obtained the permits for the plumbing.

Callaghan requested that SSW run a propane line in the backyard for a pool heater. SSW's common practice at the time was to warn homeowners about the dangers of propane, including that if propane was to be used in a vault, certain safety precautions had to be taken because propane is heavier than air. However, SSW could not recall whether it specifically warned Callaghan about the dangers of propane. SSW ultimately ran a pipe into the backyard to a location Callaghan had specified, capped it, and left a marker on it so the pool contractor could later extend it to the heater.

Approximately one year after the vault was installed, Callaghan hired Dunn's to build the pool and spa instead of Clark because Clark was busy at that time. Callaghan was friends with Nathan Dunn, the president of Dunn's, and had worked with him for a

long time. Callaghan informed Dunn's that he wanted to have the pool equipment installed in the underground vault. Callaghan did not know that a propane fueled heater should not be placed underground because it is dangerous to do so.

Dunn's built the shell for the pool and spa, completed the plumbing, and selected and purchased a natural gas heater for the pool and a kit to convert it to propane. Dunn's designed the layout of the equipment in the vault, including where the propane line would enter the vault and where to place the joint for purging air out of the propane line before starting the heater. Callaghan's role was to call the County of Riverside (the County) for inspections.

Callaghan had obtained permits for the pool and spa. The site plan he submitted to the County in connection with his pool and spa application depicted a pool vault. However, Callaghan did not obtain separate permits for the vault and propane line or have the County inspect the vault. The County and Regalado's expert testified the vault required a permit. Clark, on the other hand, testified that based on his experience, a precast, pre-engineered vault like the one he installed on Callaghan's property did not require a permit.

Employees of Dunn's, including Regalado, installed the pool equipment in the vault. Regalado had not previously installed a propane heater in a vault. Further, neither Regalado nor his supervisor, David Fleming, had read the instruction manuals for the spa heater or the propane conversion kit that Dunn's had purchased for Callaghan's project. Those instruction manuals warned of a risk of explosion if a propane heater is installed in a pit or low spot where propane gas can collect.

4

After the pool and spa were completed, Fleming asked Regalado to turn on the pool equipment and get everything ready for the County's final inspection. Fleming believed that the County had inspected the pressure in the propane line before he asked Regalado to start up the equipment. Fleming thought Callaghan had told him the line was pressure tested, but could not recall the specific conversation.

Regalado entered the vault and bled the propane line until he smelled gas. He then exited the vault and told Fleming he was ready to turn the heater on. Fleming told Regalado to go ahead. Regalado re-entered the vault and turned on the filter pump and heater.

As Regalado was climbing out of the vault, there was an explosion. The explosion was caused by the propane that Regalado had bled into the vault igniting when Regalado turned on the heater. Regalado was propelled into the air, landing on the ground outside the vault. He was severely burned, injured his back, and suffered other substantial injuries.

Regalado sued Callaghan for negligence and premises liability. Regalado alleged Callaghan negligently installed the underground vault and unventilated propane heater in that vault. Regalado asserted that Callaghan knew or should have known the installation of the unventilated pool heater was dangerous. At trial, Regalado argued Callaghan was liable because Callaghan retained control over the project by submitting plans, pulling permits, and calling for inspections, furnished the vault and propane line, asked Dunn's to put the pool equipment in the vault, and did not get separate permits for the vault and propane line while representing to Dunn's that he did so.

5

Following trial, the jury found Callaghan was negligent and that his negligence was a substantial factor in causing harm to Regalado. The jury awarded Regalado $158,080 in past economic damages, $426,000 in future economic damages, $2,000,000 for past non-economic harm, and $4,000,000 for future non-economic harm. The jury also found that Regalado and Dunn's were negligent. It apportioned 40 percent of fault to Callaghan, five percent to Regalado, and 55 percent to Dunn's. After applying the jury's fault allocation and setoffs, the trial court entered judgment against Callaghan in the amount of approximately $3 million.

DISCUSSION

I. *Alleged Instructional Error*

A. General Legal Principles

" 'Generally, when employees of independent contractors are injured in the workplace, they cannot sue the party that hired the contractor to do the work. . . . [¶] By hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes to the contractor's employees to ensure the safety of the specific workplace that is the subject of the contract.' [Citation.] One of the doctrine's underpinnings is the availability of workers' compensation to the injured employee: '[W]hen the person injured by negligently performed contracted work is one of the contractor's own employees, the injury is already compensable under the workers' compensation scheme and therefore the [law] should provide no tort remedy, for those same injuries, against the person who hired the independent contractor.' [Citation.] . . . [¶] Thus, subject to certain exceptions, when a general contractor hires a subcontractor,

6

the general contractor is not liable for injuries that occur to the subcontractor's employees." (*Brannan v. Lathrop Const. Assoc., Inc.* (2012) 206 Cal.App.4th 1170, 1175-1176 (*Brannan*).)

One exception is set forth in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*). "In *Hooker*, the court considered whether the hirer of an independent contractor could be held liable for injuries to the contractor's employee resulting from the contractor's negligence under the theory the hirer retained control of the work but negligently exercised that control. The high court held in *Hooker* 'a hirer of an independent contractor was not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but was liable to such an employee insofar as its exercise of retained control *affirmatively contributed to the employee's injuries*.' [Citation.] In such cases, the liability of the hirer is not 'vicarious' or 'derivative' in the sense that it derives from the act or omission of the hired contractor, but is direct." (*Brannan, supra*, 206 Cal.App.4th at p. 1176.)

"[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3.) Further, " '[a]ffirmative contribution' occurs where a general contractor ' "is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control occurs, for example, when the principal employer *directs*

7

that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished." ' " (*Millard v. Biosources, Inc*. (2007) 156 Cal.App.4th 1338, 1348.)

B. Additional Factual Background

Citing to *Hooker*, Callaghan proposed multiple jury instructions to cover the rule that a hirer may be held liable for injuries to a subcontractor's employee only if the hirer's negligent exercise of retained control affirmatively contributed to the employee's injury. Specifically, he sought to instruct the jury that:

> "An owner-builder owes no duty of care to an employee of a contractor to prevent or correct unsafe procedures or practices. An owner-builder's mere failure to exercise a power to compel the contractor to adopt safer procedures does not, without more, violate any duty. An owner-builder can only be held liable for injuries to the employee of its contractor if the owner-builder affirmatively contributed to the unsafe procedures or practices by direction, induced reliance, or other affirmative conduct." (Special Instruction No. 2.)

> "An owner-builder 'hirer' who hires an independent contractor to perform work is not liable for a work-related injury suffered by the independent contractor's employee, unless two criteria are met: [¶] (1) the hirer retains the ability to control some aspect of the employee's safety, and [¶] (2) the hirer's retention of control affirmatively contributed to the employee's injuries." (Special Instruction No. 7.)

> "Passively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution." (Special Instruction No. 8.)

At the jury instruction conference, the parties agreed that the court should instruct the jury with a modified version of CACI No. 1009B, which provided:

8

"Victor M. Regalado claims that he was harmed by an unsafe condition while employed by Dunn's Designer Pools and working on Jeffrey M. Callaghan's property. To establish this claim, Victor M. Regalado must prove all of the following:

"1. That Jeffrey M. Callaghan owned the property;

"2. That Jeffrey M. Callaghan retained control over safety conditions at the worksite;

"3. That Jeffrey M. Callaghan negligently exercised his retained control over safety conditions regarding design and installation of the vault and Pentair MasterTemp heater;

"4. That Victor M. Regalado was harmed; and

"5. That Jeffrey M. Callaghan's negligent exercise of his retained control over safety conditions was a substantial factor in causing Victor M. Regalado's harm."

Callaghan agreed that CACI No. 1009B was an accurate statement of the law, but continued to argue that the court should give an additional instruction that in order for him to be liable, he must have "affirmatively contributed" to Regalado's injury. Callaghan focused on Special Instruction No. 8 and urged the court to use that instruction to define "affirmative contribution" for the jury. The court declined to give the special instruction, reasoning that although it was an accurate statement of law, the concept was covered by CACI No. 1009B. Specifically, the court noted that CACI No. 1009B required the jury to find that Callaghan "*negligently exercised* his retained control," which required affirmative conduct rather than "just passively allowing something to exist."

9

Without objection, the trial court also instructed the jury on general negligence principles. First, the trial court instructed the jury with CACI No. 400 on the essential factual elements of negligence as follows:

> "Victor M. Regalado claims that he was harmed by Jeffrey M. Callaghan's negligence. To establish this claim, Victor M. Regalado must prove all of the following:

> "1. That Jeffrey M. Callaghan was negligent;

> "2. That Victor M. Regalado was harmed; and

> "3. That Jeffrey M. Callaghan's negligence was a substantial factor in causing Victor M. Regalado's harm."

The trial court went on to instruct the jury with CACI No. 401, providing: "[n]egligence is the failure to use reasonable care to prevent harm to oneself or to others. [¶] A person can be negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation."

Callaghan agreed to a special verdict form which simply asked the jury to determine whether he was negligent without differentiating between the multiple theories of negligence on which it was instructed. Callaghan had proposed another special verdict form, but the substance of that form is not in the record before us and, in any event, he agreed to the form ultimately provided to the jury.

B. Analysis

Callaghan argues the court erred by failing to instruct the jury with his special instructions regarding *Hooker's* "affirmative contribution" requirement. He contends

10

CACI No. 1009B coupled with the general negligence instructions (CACI Nos. 400 and 401) misled the jury and allowed it to find Callaghan negligent on a retained control theory based on his failure to correct an unsafe condition. Regalado responds that Callaghan cannot challenge the instructions because he agreed to the general negligence instructions.

        1. *Invited Error*

"The doctrine of invited error bars an appellant from attacking a verdict that resulted from a jury instruction given at the appellant's request." (*Stevens v. Owens-Corning Fiberglas Corp*. (1996) 49 Cal.App.4th 1645, 1653.) Indeed, the invited error doctrine "applies 'with particular force in the area of jury instructions. . . .' " (*Ibid*.) Reviewing courts will not consider claims regarding errors in jury instructions where the record does not show who requested the instructions. (*Faulk v. Soberanes* (1961) 56 Cal.2d 466, 471 ["appellant . . . has the burden to present a record sufficiently complete to establish that the claimed errors were not invited by her, and in the absence of such a showing she may not properly complain"].)

Under the invited error doctrine, where the record does not disclose which party requested an allegedly erroneous instruction, "the reviewing court *must presume that the appellant requested the instruction* and therefore cannot complain of error." (*Bullock v. Philip Morris USA, Inc*. (2008) 159 Cal.App.4th 655, 678, italics added.) Where the record is silent, we assume appellant invited the instructional error. (*Morehouse v. Taubman Co*. (1970) 5 Cal.App.3d 548, 559 [absent "any indication before us which

11

party requested the challenged instruction in the first instance . . . , it is presumed to have been given at appellant's request"].)

Here, Callaghan does not point to and we see nothing in the record that discloses which party requested CACI Nos. 400 and 401 regarding the essential factual elements of general negligence and the basic standard of care in negligence cases. The parties provided the court with a list of jury instructions in dispute. CACI Nos. 400 and 401 were not on that list. Further, Callaghan did not complain about the impact of CACI Nos. 400 and 401 on CACI No. 1009B at the jury instruction conference. Without an indication to the contrary, we presume the court instructed the jury with CACI Nos. 400 and 401 at Callaghan's request and he is barred from complaining about these instructions on appeal. (*Bullock, supra*, 159 Cal.App.4th at p. 678; *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1091.) Accordingly, we reject Callaghan's instructional challenge to the extent it rests on supposed confusion resulting from the giving of CACI Nos. 400 and 401.

2. *Special Instruction on "Affirmative Contribution"*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, "[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent

12

although the instruction may be a legal proposition.  [Citations.]' [Citation.]  Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

"The court is not required to instruct in the specific words requested by a party so long as the jury is adequately instructed on the applicable law." (*Traxler v. Varady* (1993) 12 Cal.App.4th 1321, 1332.)  "We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

Here, the trial court instructed the jury with CACI No. 1009B, which provided that for Callaghan to be liable, he must have "negligently exercised his retained control over safety conditions" and that his "negligent exercise of retained control over safety conditions was a substantial factor in causing Victor M. Regalado's harm."  Based on *Hooker*, Callaghan sought to amplify CACI No. 1009B with Special Instruction No. 2, which provided: "an owner-builder can only be held liable for injuries to the employee of its contractor if the owner-builder affirmatively contributed to the unsafe procedure or practices by *direction, induced reliance, or other affirmative conduct*" (Special Instruction No. 2).  Additionally, based on *Tverberg v. Fillner Const., Inc.* (2012) 202 Cal.App.4th 1439, 1446, Callaghan requested Special Instruction No. 8 that "*passively permitting an unsafe condition to occur rather than directing it to occur* does not constitute affirmative contribution" (Special Instruction No. 8).

13

Although drawn directly from case law, Callaghan's proposed Special Instruction Nos. 2 and 8 are somewhat misleading in that they suggest that in order for the hirer to "affirmatively contribute" to the plaintiff's injuries, the hirer must have engaged in some form of active direction or conduct. However, "affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions." (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3.) The Advisory Committee on Civil Jury Instructions recognized the potential to confuse the jury by including "affirmative contribution" language in CACI No. 1009B. The committee's use note states:

> "The hirer's retained control must have 'affirmatively contributed' to the plaintiff's injury. [Citation.] However, the affirmative contribution need not be active conduct but may be in the form of an omission to act. [Citation.] The advisory committee believes that the 'affirmative contribution' requirement simply means that there must be causation between the hirer's conduct and the plaintiff's injury. Because 'affirmative contribution' might be construed by a jury to require active conduct rather than a failure to act, the committee believes that its standard 'substantial factor' element adequately expresses the 'affirmative contribution' requirement." (Use Note to CACI No. 1009B.)

We agree with the Advisory Committee on Civil Jury Instructions that CACI No. 1009B adequately covers the "affirmative contribution" requirement set forth in *Hooker*. Callaghan's proposed Special Instruction Nos. 2 and 8 had the potential of misleading the jury and did not provide a clear statement of the law. Thus, the trial court did not err in refusing these proposed special instructions.

Callaghan also proposed, Special Instruction No. 7, which stated: an owner-builder is not liable unless "(1) [he] retains the ability to control some aspect of the

14

employee's safety, and (2) [his] retention of control affirmatively contributed to the employee's injuries." These requirements were mirrored in CACI No. 1009B. Specifically, that instruction required that Callaghan "retained control over safety conditions at the worksite" and Callaghan's "negligent exercise of retained control over safety conditions was a substantial factor in causing Victor M. Regalado's harm."

Callaghan argues CACI No. 1009B is inadequate because "[a]ffirmative contribution . . . requires something more than ordinary substantial factor causation." Indeed, "affirmative contribution must be based on a *negligent exercise* of control." (*Tverberg v. Fillner Const., Inc., supra*, 202 Cal.App.4th at p. 1446.) It is that negligent exercise of retained control that must have affirmatively contributed to the plaintiff's injuries. (*Hooker*, *supra*, 27 Cal.4th at p. 210.) Callaghan's Special Instruction No. 7 was not an accurate statement of the law because it failed to specify that the hirer must have negligently exercised his retained control. Supplementing CACI No. 1009B with Special Instruction No. 7 would have raised a danger of misleading the jury because the special instruction was duplicative and did not include the critical requirement of negligent exercise of control. In our view, CACI No. 1009B adequately instructed on the applicable law set forth in *Hooker*. (*Id*. at p. 210.) Accordingly, the trial court properly refused to instruct the jury with proposed Special Instruction No. 7.

## II. *Sufficiency of the Evidence*

Callaghan argues insufficient evidence supported the jury's verdicts on both premises liability and negligence. We reject Callaghan's argument.

15

Under the well-established standard of review applicable to a claim that a judgment or finding is not supported by the evidence in the record, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631 (*Howard*).)

Where two theories are presented to a jury, of which only one is supported by substantial evidence, and a general verdict is returned in favor of the plaintiff, it is presumed that the verdict was based on the theory that is supported by the evidence. (*Lundy v. Ford Motor Co*. (2001) 87 Cal.App.4th 472, 480 (*Lundy*).) "Thus, on review of the underlying judgment, the general verdict will be upheld if sufficient as to any one of

16

the causes of action alleged." (*Stonelight Tile, Inc. v. California Ins. Guarantee Assn.* (2007) 150 Cal.App.4th 19, 39.)

Here, the trial court instructed the jury on multiple theories of liability, including general negligence, premises liability, and liability based on retention of control over safety conditions. The jury found Callaghan was negligent, but did not specify which theory of liability it relied upon. Thus, we will uphold the jury's verdict if any theory was supported by substantial evidence. (*Lundy, supra*, 87 Cal.App.4th at p. 480.)

Viewing the evidence in the light most favorable to Regalado, there was substantial evidence supporting liability based on Callaghan's negligent exercise of his retained control over safety conditions. Under that theory, the jury had to find: (1) Callaghan owned the property, (2) Callaghan retained control over safety conditions, (3) Callaghan negligently exercised his retained control over safety conditions regarding the design and installation of the vault and propane heater, (4) Regalado was harmed, and (5) Callaghan's negligent exercise of his retained control was a substantial factor in causing Regalado's harm (CACI No. 1009B). Callaghan does not dispute the first and fourth elements. Thus, we focus on whether there was substantial evidence to support findings that Callaghan retained control over safety conditions and negligently exercised that control in a manner that affirmatively contributed to Regalado's injuries.

The County and Regalado's expert testified that the vault and propane line required a permit. According to Regalado's expert, the purpose of obtaining permits and inspections is to ensure the work is done safely. Callaghan was responsible for obtaining

17

permits and calling for inspections. Thus, there was sufficient evidence that he retained control over safety conditions.

Without obtaining permits for the vault and propane line, Callaghan and another contractor installed the vault, modified its entry and exit point, and ran a propane line that would eventually be connected to the vault. According to Regalado's expert, it was below the standard of care for an owner-builder such as Callaghan to fail to obtain permits for the vault and propane line. In the expert's opinion, Callaghan's failure to go through the proper permitting and inspection process was a substantial factor in causing the accident. Specifically, the expert testified that if Callaghan would have gone through the appropriate process, he would not have had a design that included an underground vault with propane piped into it without a proper ventilation system. The expert explained that permits are "a double-check so that people don't just build whatever they want, wherever they want, in any way they want. They have very specific rules that they have to follow, and the permitting process is a process by which that double-check is created." Further, according to Fleming, Callaghan represented that the County had inspected the pressure in the propane line before the accident and that all steps of the construction had passed inspection. Based on this evidence, a reasonable trier of fact could conclude that Callaghan negligently exercised his retained control over safety conditions in a manner that affirmatively contributed to Regalado's injuries.

We recognize that Callaghan presented conflicting evidence on many points. However, our task is not to reweigh the evidence or substitute our judgment for that of the trier of fact. Rather, based on our standard of review, we resolve all conflicts in the

18

evidence in favor of Regalado and give him the benefit of every reasonable inference. (*Howard, supra*, 72 Cal.App.4th at pp. 630-631.) Based on that standard and the record before us, there is substantial evidence to support of the judgment.

### III. *Alleged Attorney Misconduct*

A. Additional Background

During closing argument, Regalado's counsel told the jury that its decision would impact the community. Regalado's counsel started off his argument by telling the jury members that acting as a juror is an important civic duty. He continued, "Your voice really is going to have an impact. [¶] . . . You are the voice. You are the conscience of this community. You are going to speak on behalf of all the citizens in Riverside County and, in particular, Coachella Valley. [¶] You are going to make a decision what is right and what is wrong; what is acceptable, what is not acceptable; what is safe, and what is not safe. You are going to announce it in a loud, clear, public voice. And that is going to be the way it is."

Regalado's counsel went on to state that "[t]hese courtrooms, these courthouses, exist for one reason: It's to keep the community safe. Period. That is the sole function of courtrooms, and it's why the state spends so much money on courtrooms. [¶] In the criminal part of the system, the jury identifies criminals and gets rid of them. . . . It's a matter of public policy, public safety. [¶] On the civil end of things, same function it's all about keeping the community safe. You identify bad conduct, negligent conduct. You don't send anybody to jail, but you announce what it is, and everybody is going to live by it. And in the civil end, you, the jury, tells the wrongdoer, 'You are going to compensate

19

the person you hurt.' [¶] . . . And you are going to tell the wrongdoer, 'If you do this stuff in our community, you are going to pay.' "

After a break and after Regalado's counsel had continued through a significant portion of his closing argument, Callahan's counsel objected, stating "[Regalado's] counsel is making a reptile argument where he's talking about the role of the jury verdict in enforcing the greater good for the general public." The trial court found the objection was untimely.

B.  Analysis

Callaghan argues Regalado's counsel committed misconduct by urging the jury to base its verdict on protecting the community.

"The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury." (*Martinez v. State* (2015) 238 Cal.App.4th 559, 566.) For example, "[a]n attorney representing a public entity commits misconduct by appealing to the jurors' self-interest as taxpayers." (*Ibid.*) "An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796 (*Cassim*).)

To preserve a claim of attorney misconduct for appeal, a timely and proper objection must have been made at trial; otherwise, the claim is forfeited. (See *Cassim, supra*, 33 Cal.4th at pp. 794-795; *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 211.) "In addition to objecting, a litigant faced with opposing counsel's misconduct must

either 'move for a mistrial or seek a curative admonition' [citation]" unless an admonition would have been inadequate under the circumstances. (*Cassim,* at p. 795.)

Here, although in our view the remarks from Regalado's counsel telling the jury that its verdict had an impact on the community and that it was acting to keep the community safe were improper, the comments were so brief that they were not prejudicial in our view. (See *Cassim, supra*, 33 Cal.4th at pp. 802-803.) Regardless, we need not reach the issue because Callaghan failed to timely object to the remarks and failed to request a curative admonition. There is nothing in the record that indicates an objection and admonition would not have cured the prejudice, if any, arising from those remarks. Accordingly, Callaghan forfeited his argument on appeal. (*Id*. at pp. 794-795.)

IV. *Collateral Source Rule*

A. Additional Background

Regalado did not work for four years after the accident. He received worker's compensation benefits. Dunn's continued to pay his salary during that time. At an Evidence Code section 402 hearing, Dunn testified that he continued to pay Regalado because he knew worker's compensation benefits were less than the salary Regalado regularly made and Regalado was the only income earner in his household. According to Dunn, he continued to pay Regalado to help Regalado and Regalado's family. Dunn hoped that if he was in the same position and the only person working in his household, someone would do the same thing for him. Dunn did not expect to receive anything in return for paying Regalado's salary. Regalado returned to work for Dunn's in June 2014, as a cost estimator.

21

The trial court found that payments Dunn's made to Regalado during the four years Regalado did not work were intended as a gift. Thus, the trial court excluded evidence of those payments under the collateral source rule. The jury ultimately awarded Regalado $158,080 in past lost earnings.

B.  Analysis

Callaghan argues the trial court erred by permitting Regalado to recover past wages because Dunn's continued to pay his salary. Specifically, Callaghan contends wage payments from Dunn's do not fall within the collateral source rule because Dunn's was a joint tortfeasor.

Under the collateral source rule, "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be reduced from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) However, " 'payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing pro tanto the amount of the damages he may be entitled to recover.' Hence, the rule applies only to payments that come from a source entirely independent of the tortfeasor and does not apply to payments by joint tortfeasors or to benefits the plaintiff receives from a tortfeasor's insurance coverage.' " (*Id*. at p. 8, fn. 7.)

22

In *Arambula v. Wells* (1999) 72 Cal.App.4th 1006, 1009 (*Arambula*), the court rejected the defendant's argument that because plaintiff's employer gratuitously paid his wages, the plaintiff was precluded from recovering the value of his lost wages. The court reasoned that "[i]f a generous person chooses to pay the wages of someone who has been injured, intending to add the gift to the latter's compensation, 'there seems to be no good reason for denying effect to such intention or for diverting it to another beneficiary, whether that other is a wrongdoer or not.' " (*Id.* at p. 1013.) "The rationale of the collateral source rule thus favors sheltering gratuitous gifts of money or services intended to benefit tort victims." (*Id.* at p. 1014.)

Here, substantial evidence supported the trial court's conclusion that payments from Dunn's to Regalado during the four years Regalado did not work were intended as gifts. Callaghan does not dispute the trial court's factual finding, but argues Dunn's is not a collateral source because it was a joint tortfeasor. Callaghan further argues *Arambula* does not apply because the opinion did not indicate whether plaintiff's injury was work-related and whether the employer was a joint tortfeasor. We are not persuaded.

Regalado's sole remedy as against Dunn's was through the worker's compensation system. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 15-16.) "[T]he legal theory supporting such exclusive remedy provisions is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the

23

wider range of damages potentially available in tort." (*Id*. at p. 16.) Thus, although the jury found Dunn's was 55 percent at fault for Regalado's injuries, Dunn's had no legal obligation to pay his salary and was not liable for any damages payments. According to Dunn, he did not expect anything in return and merely wanted to help Regalado and Regalado's family. In this case, we see no reason why a gift from Dunn's should be treated differently than a gift from any other third party.

Where, as here, the evidence supports the trial court's conclusion that Dunn's made payments to Regalado as a gift and Dunn's had no obligation to make the payments, we see no reason why the payments should be considered anything other than gratuitous payments covered by the collateral source rule. The reasoning set forth in *Arambula* is equally applicable whether or not the jury found Dunn's was negligent because Dunn's had no obligation to pay Regalado's damages. (*Arambula, supra*, 72 Cal.App.4th at pp. 1011-1014.)

## V. *Future Medical Costs Award*

A. Additional Background

Dr. David Tahernia, an orthopedic spine surgeon treated Regalado after his accident. Regalado complained that he had pain in his back radiating down his left leg. Dr. Tahernia concluded that Regalado suffered from spinal stenosis and spondylolisthesis, which is misalignment of part of the spine. Dr. Tahernia attempted to treat Regalado with conservative treatment options, but Regalado ultimately needed surgery. Regalado underwent surgery without complications, but continued to complain of back and leg pain with numbness.

24

Dr. Tahernia explained that an effect of the surgery for spondylolisthesis is that stress can be transferred to a neighboring spinal segment. In Dr. Tahernia's opinion, it is more likely than not that Regalado will require a future surgery to fix the problem. Dr. Tahernia testified that Regalado began to develop hypermobility in one of his spinal segments. He continued, "from a biomechanical perspective, the stress is transferred to the level above, and that level above is starting to move a little bit more than it normally would. When that happens, it is more likely to develop instability, more likely to develop arthritic changes that could lead one to need additional surgery in the future." Callaghan's expert testified that the likelihood that Regalado will need future surgery on an adjacent spinal segment is less than 25 percent.

Regalado's expert testified that the present value of Regalado's future medical costs is $578,460 with a spine fusion surgery or $276,229 without it. The jury awarded Regalado $426,000 in future medical damages.

B. Analysis

Callaghan argues the jury's award of future medical costs must be reduced because it was not supported by substantial evidence. Specifically, he argues that Dr. Tahernia's opinion that it was more likely than not that Regalado will require future surgery was conjecture and lacked a factual basis. We disagree.

"Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future." (Civ. Code, § 3283.) It is well-settled that "[p]rospective detriment must be so proven that from the proof the [trier of fact] can reasonably conclude that the claimed detriment is reasonably certain to

25

occur." (*Khan v. Southern Pac. Co.* (1955) 132 Cal.App.2d 410, 416 (*Khan*).)  "[I]t is generally a question for the [trier of fact] to determine from the evidence whether or not the claimed prospective detriment is reasonably certain to occur." (*Ibid.*)  It is "not required" for a doctor to "testify that he [is] reasonably certain that the plaintiff would be disabled in the future.  All that is required to establish future disability is that from all the evidence, including the expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty." (*Paolini v. City & County of San Francisco* (1946) 72 Cal.App.2d 579, 591.)  The fact that the amount of future damages may be difficult to measure or subject to various possible contingencies does not bar recovery.  (*Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745.)

An award of damages must be predicated on something more than mere possibilities.  (*Metcalf v. Drew* (1947) 78 Cal.App.2d 226, 232.)  "[I]t is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989.)

As detailed above, Dr. Tahernia opined that it was more likely than not that Regalado will need future surgery because Regalado began to develop hypermobility in one of his spinal segments.  Callaghan claims Dr. Tahernia's opinion was speculative because Dr. Tahernia testified that individuals with hypermobility are "*more likely* to develop arthritic changes that *could* lead one to need additional surgery."  The fact that there was some uncertainty as to whether Regalado would develop arthritic changes requiring additional surgery does not preclude a finding that it was reasonably certain he

26

would need future surgery.  For example, in *Ostertag v. Bethlehem etc. Corp*. (1944) 65 Cal.App.2d 795, the plaintiff's expert testified, based on his examination of plaintiff, " 'it is reasonable to assume he is going to have trouble . . . in the future.  Just how much, I don't know.  Just what the course of that trouble will be, I don't know.' "  (*Id*. at pp. 805-806.)  The court found this testimony "sufficient to support a finding of future damages with reasonable certainty."  (*Id*. at p. 806.)  Similarly, the plaintiff's expert in *Guerra v. Balestrieri* (1954) 127 Cal.App.2d 511, based his opinion on future damages on the fact plaintiff was still experiencing pain two years after the accident and his experience that " '[f]requently in this type of neck injury a patient will continue to have symptoms indefinitely' and '[i]t may last forever; . . . it may get worse; he may improve somewhat.' "  (*Id*. at pp. 518-519.)  The court held, "[f]rom such testimony the jury could reasonably conclude that plaintiff was reasonably certain to experience some pain and disability for the rest of his life."  (*Id*. at p. 519.)

Dr. Tahernia testified that Regalado had surgery on one segment of his spine that had healed, but as a person ages, some stress can be transferred to an adjacent spinal segment.  Based on his review of Regalado's x-rays, Dr. Tahernia stated Regalado demonstrated hypermobility in an adjacent spinal segment and, as a result, Regalado was more likely to develop arthritic changes requiring surgery in the future.  In Dr. Tahernia's opinion, Regalado would more likely than not need future surgery.  Based on this evidence, the jury could conclude it was reasonably certain that Regalado would require a future spinal surgery.

27

## DISPOSITION

The judgment is affirmed.  Regalado is entitled to recover costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


HALLER, J.

Filed 9/22/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VICTOR M. REGALADO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEFFREY M. CALLAGHAN,<br><br>    Defendant and Appellant. | D069647<br><br><br>(Super. Ct. No. INC1203669)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION |

THE COURT:

The opinion in this case filed September 16, 2016 was not certified for publication.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

_____
                                          HUFFMAN, Acting P. J.

Copies to:  All parties