Filed 10/21/24  Sacramento Municipal Utility District v. Torres CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | C098044 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2019-00251807-CU-PO-GDS) |
| v. | |
| MARCO TORRES, | |
| Defendant and Appellant. | |

Defendant Marco Torres operated marijuana grows in houses at two locations, Wheatland Drive in Sacramento (Wheatland Drive) and Buford Court in Antelope (Buford Court).  To aid in his enterprise, Torres stole power from plaintiff Sacramento Municipal Utility District (SMUD) by circumventing SMUD's meters using an electrical bypass at each location.  After the power theft was discovered and stopped, SMUD commenced this civil action for damages for the unbilled electricity.  After a bench trial, the trial court awarded SMUD actual damages in the amount of $160,372.77.  On SMUD's power theft cause of action, the court trebled the actual damages to $481,118.31

1

under Civil Code section 1882.2.[1]  On SMUD's conversion cause of action, the court awarded SMUD $320,745.54 in punitive damages which, combined with the actual damages, also totaled $481,118.31.  The court specified that these two damages awards were coextensive rather than cumulative.

On appeal, Torres argues that: (1) issue preclusion barred relitigation of the duration of his power theft because the relevant dates were determined in a restitution proceeding in his prior criminal prosecution; (2) the actual damages award is not supported by substantial evidence; and (3) punitive damages were not justified.  We will vacate the award of punitive damages and otherwise affirm the judgment.

BACKGROUND

SMUD filed a complaint against Torres asserting causes of action to recover damages for, among other things, power theft (§ 1882.1), conversion, and breach of contract.  SMUD alleged these acts occurred at two locations, Wheatland Drive and Buford Court.

*The Trial*

At trial, there was no dispute that Torres committed power theft.  The parties stipulated to Torres's diversion of electricity at both addresses.  Torres also admitted to growing marijuana and power theft, which resulted in Torres sustaining a misdemeanor conviction.

*Testimony of Defendant Marco Torres*

*Wheatland Drive*

Torres purchased and moved into the Wheatland Drive property in February 2009 and opened a SMUD account.  Several people stayed with Torres over the years, including Josue Bautista, who lived there from 2010 through 2015, after which Bautista

---

[1]     Subsequent section references are to the Civil Code.

moved to the Buford Court address. Torres's nephew, Jose Tiznado, stayed at Wheatland Drive "[m]ore than a few times." However, Jose never lived with Torres, and Torres did not recall Jose's wife Alexandra[2] staying at Wheatland Drive.

At some point, Torres decided to grow marijuana. He installed electrical bypasses at both the Wheatland and Buford Court properties to avoid being billed by SMUD for the electricity he would use. He did not remember when he started growing marijuana at Wheatland Drive, when he installed the electrical bypass, or how long he used it, but he asserted that he did not use the electrical bypass for more than six months.

Torres testified that he never actually grew anything at Wheatland Drive. He claimed that he only had four grow lamps in a room he built in the garage. He would start growing "bab[y]" plants at Wheatland Drive and then transport them to Buford Court. Torres denied growing marijuana in any room at Wheatland Drive other than the room in the garage.

The Sacramento County Sheriff's Department executed a search warrant at Buford Court on February 20, 2018. Torres removed the electrical bypass at Wheatland Drive that same day. The next day, February 21, 2018, the sheriff's department executed a search warrant at Wheatland Drive.

Torres acknowledged that, when the Sacramento County Sheriff's Department executed the search warrant, there was equipment for growing marijuana throughout the Wheatland Drive property, including in the backyard and the master bedroom. Photographs taken at Wheatland Drive showed grow trays, mini split air conditioners, lights, a filter, and other items used in his marijuana grow operation. But he testified that these items were from Buford Court; after the execution of the search warrant there, he brought all of the equipment to Wheatland Drive.

---

[2]     Given the witnesses shared surname, we will refer to them at times by their first names. No disrespect is intended.

3

Torres identified in a photograph a bedroom at Wheatland Drive that was empty except for a ladder, some flooring on the floor, and a chair. He testified that patchwork and paint on the walls and ceilings were simply from testing paint colors. He also testified there was a hole in one bedroom wall because he "kick[ed] it by accident." In another bedroom ceiling, there was patchwork where there had been some holes. Additional patchwork in a bedroom was from a leak. He testified he was remodeling the house. Torres acknowledged that, in marijuana grow operations, holes are placed in surfaces for ventilation, but denied that is what appeared in the photograph. Asked about the fact that no beds appeared in any of the photographs, Torres testified that there was a bed in one of the small rooms.

When asked why he installed an electrical bypass at Wheatland Drive if he was only using four grow lights, Torres testified it was a mistake, and that he did not think about what he was getting into. He also testified four grow lights required too much power to plug into a wall outlet to be metered.

*Buford Court*

Torres began to lease the Buford Court property in 2015. He opened a SMUD account, and the first bill was dated October 13, 2015. Initially, he sublet Buford Court to Josue Bautista, during which time Torres did not grow marijuana or use an electrical bypass at that location. After Bautista moved out in the summer of 2017, Torres began using three rooms for a marijuana grow and began growing plants in June or July 2017. There was a fourth grow room in the house, but Torres did not install another electrical subpanel and instead paid for the power used in that room. Torres testified he operated the marijuana grow for seven or eight months before he "got caught."

Receipts produced at trial dated September 20, 2017, were for the purchase of marijuana grow supplies. Torres testified they were receipts for supplies for the Buford Court marijuana grow. On cross-examination, he acknowledged the receipts were from a store in Lindsay, California. He testified that he shopped in Lindsay because he was

4

going camping and he figured, "might as well buy it here." He thus agreed that he bought $8,900 worth of marijuana grow supplies while he was going camping. Asked if there were garden supply stores in Sacramento, he testified, "I guess so."

*Testimony of Alexandra Tiznado*

Alexandra Tiznado was married to Jose Tiznado, Torres's nephew. She was familiar with the Wheatland Drive property. At some point between 2011 and 2012, she stayed overnight roughly three days a week while Jose was temporarily living there. This started around November 2011. Jose moved out at some point between May and July 2012.

Alexandra testified that, when she was staying at Wheatland Drive between November 2011 and June 2012, she saw the property being utilized as a marijuana grow. Although she could not recall exact dates, she estimated that she saw a full marijuana grow in the master bedroom in early 2012. She saw grow lights hanging in the room, plants, trays, and ballasts. There were at least five trays of plants in the master bedroom. Before her overnight visits stopped, she believed the room across from the master bedroom was also gradually converted into a marijuana grow.

*Testimony of Mike Wolff*

Mike Wolff was a revenue protection representative for SMUD. His role was to discover, investigate, and stop power theft. Wolff investigated the suspicion of power theft at both Wheatland Drive and Buford Court, reviewing voltage patterns as far back as when the data was available, January 1, 2016. His analysis indicated power theft. Asked if his analysis was consistent with Torres's "story that both of those grows only started in September, 2017," Wolff responded: "I would say that blows that out of the water because . . . both of these locations were clearly growing as early as" January 2016.

*Wheatland Drive*

Wolff performed an analysis of Wheatland Drive from January 1, 2016, through January 24, 2016. His analysis indicated Torres was not paying for the electricity he was

5

using.  Wolff ran this analysis for every few months going forward.  The results were consistent throughout the time period encompassed in Wolff's investigation.

SMUD placed a distribution transformer monitor, which measures the electricity provided from the transformer to the residence, in the transformer that provided power to Wheatland Drive.  SMUD would take daily readings from the device of the power actually provided to the address, subtract the amount of electricity actually recorded on the meter at the address, "and then you're left with the unbilled energy amount." According to Wolff, "[W]e're taking an average of these daily bypassed amounts, and then that's what we're going to use to determine what we're billing them for every single day back to when . . . we determine that the grow started."  Based on 12 days of monitoring from February 8, 2018, through February 19, 2018, on average, Wheatland Drive used 277 kilowatt hours (kWh) per day more than what it was billed based on metered usage.  Wolff testified that 277 kWh per day was reasonable, and even on the low end, for a marijuana grow in a house the size of Wheatland Drive.

The power theft at Wheatland Drive ended on February 20, 2018, at approximately 9:00 p.m., the day the Sacramento County Sheriff's Department executed the search warrant at Buford Court.  The Sacramento County Sheriff's Department executed a search warrant at Wheatland Drive the next day.  It appeared to Wolff, who was present at the time, that all of the marijuana grow equipment "had been taken down in a hurry," shortly before law enforcement arrived.  The property "no longer had lights hanging or a bypass installed or marijuana plants in trays or anything . . . ."  However, there were marijuana grow items all around the house.  There was new patchwork on the sheetrock, and it appeared that the electrical bypass had been recently removed.  There was also a lot of equipment in the backyard, including grow trays, a blower, and grow lights.

Wolff did not think the explanation that the marijuana grow equipment came from Buford Court made sense because "Buford [Court] had already had the search warrant served the day before, and it was locked up, posted substandard.  Nobody is coming back

6

to that location." He further noted that the equipment was scattered throughout the house rather than, for example, being stacked in the garage. Wolff testified that the four lamps in the garage would draw a fraction of the unbilled electricity used at Wheatland Drive.

On a goldenrod form, the form he would prepare and send to SMUD billing, Wolff directed billing to recalculate the bill for Wheatland Drive, adding an additional 277 kWh per day beginning from the start date of service and extending to February 19, 2018. Wolff noted that "we like to bill from inventory, because that's the most accurate way that we can see, because based on the equipment that they're actually using and bypassing." However, given the state of the marijuana grow at Wheatland Drive when the search warrant was executed, Wolff "had no other choice but to bill this one with the . . . daily average bypass amount."

*Buford Court*

Wolff performed amp readings in December 2017 and February 2018 at Buford Court and confirmed power theft. Wolff testified that there was already a marijuana grow at Buford Court as of January 1, 2016, which started before that date, where electricity was not being paid for. Wolff opined that cultivation was ongoing as of January 1, 2016, because "it's half way through a grow cycle on the first . . . ." As with Wheatland Drive, Wolff analyzed usage every couple of months, during which the marijuana grow and the power theft were ongoing. The marijuana grow was still operating as of January 12, 2017, it paused on January 16, 2017, and it resumed around March 20, 2017.

A search warrant was executed at Buford Court on February 20, 2018. When Wolff went into the property, he found that SMUD's service wires in the wall leading to the meter had been tampered with using insulation-piercing connectors. Based on his observations, Wolff concluded that the marijuana grow had been going on for a long time.

Wolff prepared an inventory sheet of all of the bypassed electrical equipment at Buford Court. He used the list of bypassed devices and equipment to calculate the kilowatt hours of power that were not being paid for. The resulting 466 kWh per day

7

discrepancy was in line with marijuana grows in houses of a similar size. The diversion dates on the goldenrod form for Buford Court were from September 30, 2015, the date service commenced, through February 20, 2018, the day the search warrant was executed.

With regard to the receipts for marijuana grow supplies from the store in Lindsay, Wolff testified that there was a disparity between the items on the receipts and the supplies at Buford Court. Wolff also testified that the Lindsay store was very far from Sacramento, beyond Fresno. Wolff testified there were many hydroponics stores in the Sacramento area, and it is not clear why someone would travel to Lindsay to purchase such supplies.

*Testimony of Victoria Ricarte*

Victoria Ricarte, a revenue analyst in the billing operations department at SMUD, testified that her role included analyzing charges and fees billed in cases of power theft to ensure billed amounts are correctly calculated. She prepared recalculations of bills for Wheatland Drive and Buford Court.

Ricarte testified that when SMUD bills a power theft period, it bills from the beginning of the period of power theft to when the power theft was caught. When billing receives the goldenrod form, they first identify the diversion dates to see when the diversion began and when it ended. Then they multiply the duration by the additional kWh per day to be billed. This information is furnished by power theft investigators.

According to the goldenrod form, for Wheatland Drive, the kilowatt hours per day previously underbilled was 277 kWh per day. For Buford Court, the unbilled amount was 466 kWh per day.

*Ruling, Statement of Decision, and Judgment*

The trial court ruled that SMUD met its burden of proof on its claims for power theft, conversion, and breach of contract. The court found SMUD had sustained actual damages in the amount of $160,372.77. On its claim for power theft, the court awarded SMUD treble damages (§ 1882.2), increasing SMUD's award to $481,118.31. On the

8

conversion cause of action, the court found by clear and convincing evidence that Torres was guilty of malice and awarded SMUD punitive damages in the amount of $320,745.54. (§ 3294.) Thus, on the conversion claim, combining the actual damages and the punitive damages, the total award was also $481,118.31. The court specified that the two matching awards reflected the same damages and should be deemed to overlap rather than be added together. The judgment was in favor of SMUD and against Torres in the amount of $481,118.31.

DISCUSSION

I

*Issue Preclusion*

Torres contends that the trial court already determined the duration of the power theft in a restitution hearing in his criminal case. Therefore, collateral estoppel barred the trial court from "redetermin[ing]" these time periods. SMUD responds that it was neither a party nor in privity with a party to the prior restitution proceedings. We conclude that issue preclusion did not bar the trial court from determining the duration of the power theft.

" 'Issue preclusion,' " formerly referred to as " 'collateral estoppel,' " prevents " 'relitigation of previously decided issues.' " (*Samara v. Matar* (2018) 5 Cal.5th 322, 326-327.) Issue preclusion "applies only '(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.' " (*Id*. at p. 327.)

SMUD was not a party to Torres's criminal prosecution. Thus, issue preclusion could only apply if SMUD was in privity with the People, who conducted the restitution proceeding. However, in his briefing, Torres does not argue privity or make any argument as to why SMUD, which was not a party to the restitution proceeding, should be bound by the determinations in that proceeding. For that matter, Torres does not cite any authority to support his issue preclusion argument. (See Cal. Rules of Court, rule

9

8.204(a)(1)(B) [each brief must "support each point by argument and, if possible, by citation of authority"].)

In any event, we conclude that none of the commonly articulated hallmarks of privity appear to be present in SMUD's relationship with the People in their prosecution of the restitution proceeding. SMUD did not acquire " 'an interest in the subject matter of litigation . . . after rendition of the judgment through or under one of the parties, as by inheritance, succession or purchase.' " (*Kerner v. Superior Court of Los Angeles County* (2012) 206 Cal.App.4th 84, 125.) SMUD and the People did not have " 'a mutual or successive relationship to the same rights of property, or to such an identification in interest . . . as to represent the same legal rights.' " (*Ibid*.) We could not say the relationship between SMUD and the People was " ' "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' " (*Ibid*.) Nor was there a " 'sharing of "an identity or community of interest," with "adequate representation" of that interest in the [restitution proceeding], and circumstances such that [SMUD] "should reasonably have expected to be bound" by the' " restitution proceeding. (*Grande v. Eisenhower Medical Center* (2022) 13 Cal.5th 313, 326, quoting *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 826.) We cannot conclude that SMUD had an interest so similar to that of the People in conducting the restitution proceeding " 'that the [People] acted as [SMUD's] " ' "virtual representative" ' " ' " in that proceeding. (*Grande v. Eisenhower Medical Center, supra*, 13 Cal.5th at p. 326; see generally *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386 [restitution orders aim to compensate the victim, rehabilitate the defendant, and deter the defendant and others from committing future offenses].)

Torres has not met his burden of establishing that the trial court erred in concluding that issue preclusion did not apply. (See *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766 ["It is the appellant's burden to demonstrate the existence of reversible error"].)

10

## II

### *Substantial Evidence Supporting the Award of Actual Damages*

Torres argues that the trial court's award of damages as to each location was not supported by the evidence, both as to when the power theft began and the amount of damages sustained by SMUD. We do not agree.

A. *Applicable Principles of Law*

"A question of the proper measure of damages in a particular case is . . . an issue of law subject to de novo review . . . ." (*Switzer v. Wood* (2019) 35 Cal.App.5th 116, 125.) " ' "The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence." ' " (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324.) "Substantial evidence means evidence of ponderable legal significance that is reasonable, credible, and of solid value." (*Gillotti v. Stewart* (2017) 11 Cal.App.5th 875, 899.) In considering a claim that substantial evidence does not support the judgment, " 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 595-596 (*Regalado*).)

" 'To recover in tort, the plaintiff must prove the fact of proximately caused injury with reasonable certainty. [Citation.] When the fact of proximately caused injury is proven sufficiently, the measure of damages to be awarded need only be shown with the degree of certainty that the circumstances of the case permit.' " (*Sacramento Municipal Utility Dist. v. Kwan* (2024) 101 Cal.App.5th 808, 815.) In a utility theft case such as this, "there is an ongoing injury causing damages," but "the period of injury may be

11

uncertain." (*Ibid*.) Therefore "the contested damages issue is . . . often the extent of the injury," in other words, the duration of the injury and the amount of energy stolen over that period of time. (*Ibid*., italics omitted.) A "defendant who has been found liable for utility diversion should not benefit from the secrecy of his or her theft . . . ." (*Id*. at p. 816 [the defendant should not benefit from his secrecy by applying an assumption that power theft began at the date of discovery].) "It instead depends on the evidence of each case to establish 'the fact of proximately caused injury with reasonable certainty.' " (*Ibid*.)

B. *Wheatland Drive–Duration of Power Theft*

It is undisputed that SMUD sustained injury as a result of Torres's power theft. It is also clear when Torres's power theft ended, upon SMUD's discovery of the power theft and the execution of search warrants at the two addresses. The only contested issues are when the power theft *began* at each location and the amount of damages to be assessed for the power theft.

Torres argues that the trial court's finding that he operated a large marijuana grow using an electrical bypass at Wheatland Drive beginning in July 2012 was not supported by the evidence for two reasons. First, he contends there was no evidence he began a large marijuana grow operation when Jose Tiznado moved out because "he had more room," and the court's determination was "pure speculation."

Torres moved into Wheatland Drive and opened a SMUD account in February 2009. Alexandra Tiznado observed a marijuana grow at Wheatland Drive between November 2011 and June 2012, during which time she spent several nights a week at that house. According to Alexandra, there was a full marijuana grow in the master bedroom in early 2012, including lights, plants, trays, ballasts, and at least five trays of plants. Additionally, she believed the room across from the master bedroom was gradually converted into a marijuana grow. Her overnight visits at Wheatland Drive stopped between May and July 2012, when her husband Jose moved out of that house. Mike

Wolff's analysis of Wheatland Drive indicated ongoing power theft as of January 1, 2016, the farthest back he could review. The power theft ended on February 20, 2018.

Substantial evidence supports the trial court's determination that Torres's marijuana grow operation at Wheatland Drive began in July 2012, after Jose Tiznado moved out. The court's determination is supported by Alexandra's testimony about the large marijuana grow operation existing in the master bedroom and expanding to another room by the time Jose moved out in July 2012. Torres's testimony that he did not grow marijuana or divert power with an electrical bypass at Wheatland Drive for more than six months gave rise to a conflict in the evidence for the trier of fact to resolve. The trial court expressly found Alexandra Tiznado's testimony more credible. The court's determination is also supported by Mike Wolff's testimony that there was an ongoing marijuana grow at Wheatland Drive as of January 1, 2016, contradicting Torres's testimony that he did not begin to grow marijuana at Wheatland Drive until summer or fall 2017. It was for the trier of fact, not for us on appeal, to weigh these conflicts and disputes in the evidence. (*Regalado, supra*, 3 Cal.App.5th at p. 596.)

Torres's proffer of 2017 receipts for marijuana grow supplies from a store in Lindsay, suggesting he did not begin to grow marijuana before 2017, does not undermine our conclusion. The trial court observed that Torres's assertion that "he bought equipment 225 miles away, in Lindsay, for use in Sacramento seems unlikely." In light of the other evidence, the receipts do not establish that Torres did not begin to grow marijuana until 2017. As stated, " 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment,' " and " '[w]e must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment.' " (*Regalado, supra*, 3 Cal.App.5th at pp. 595-596.)

Second, Torres argues there was no evidence to establish that he used an electrical bypass beginning in July 2012. Torres is correct that Alexandra Tiznado testified that she did not know whether there was an electrical bypass installed at Wheatland Drive. However, Torres admitted to installing the electrical bypass at Wheatland Drive, although he claims he did so no more than six months prior to discovery of his power theft in 2018. Mike Wolff identified power theft as early as January 2016. This was long before Torres's admitted use of the electrical bypass. Given this discrepancy, and its findings that Torres's testimony on this point was "unconvincing" and had been "discredited," it was reasonable for the trial court to infer that the power theft began with the installation of an electrical bypass when Torres began the full marijuana grow in 2012.

Substantial evidence supported the trial court's determination that SMUD established with reasonable certainty that Torres's full marijuana grow and power theft had begun by July 2012.

C. *Wheatland Drive–Amount of Damages*

Torres further claims there was not sufficient evidence to establish the amount of damages SMUD sustained as a result of his power theft at Wheatland Drive. He suggests that taking the average amount stolen over a 12-day period and extrapolating the total amount from that data did not amount to a reasonable certainty in the damages award.

Mike Wolff testified that SMUD placed a distribution transformer monitor, which measures the electricity provided from the transformer to the residence, in the transformer that provided power to Wheatland Drive. SMUD would take daily readings from the device of the power actually provided to the address, subtract the electricity recorded on the meter, "and then you're left with the unbilled energy amount." According to Wolff, "[W]e're taking an average of these daily bypassed amounts, and then that's what we're going to use to determine what we're billing them for every single day back to when . . . we determine that the grow started." Based on 12 days of monitoring from February 8, 2018, through February 19, 2018, on average, Wheatland

14

Drive used 277 kWh per day more than what it was billed. Wolff testified that 277 kWh per day was reasonable, and even on the low end, for a marijuana grow in a house the size of Wheatland Drive.

As SMUD notes, it would be unreasonable, and, in fact, impossible, to require a utility to establish the amount of power actually diverted for the entire duration of the power theft. The utility cannot measure the power diverted before it discovers the diversion. A "defendant who has been found liable for utility diversion should not benefit from the secrecy of his or her theft . . . ." (*Sacramento Municipal Utility Dist. v. Kwan, supra*, 101 Cal.App.5th at p. 816.) Torres has not cited to any authority, nor are we aware of any, to establish that this method of calculating the energy stolen and the resulting damages was insufficient.

Substantial evidence supports the conclusion that Mike Wolff's testimony and the methodology he employed yielded an average amount of electricity diverted with reasonable certainty.

D. *Buford Court–Duration of Power Theft*

Torres maintains that there was no evidence to establish that his power theft at Buford Court began on September 30, 2015, the day he commenced service.

Torres leased the Buford Court property in 2015, but he did not live at the property. When Josue Bautista left the property in the summer of 2017, Torres began to use four rooms for a marijuana grow. Torres testified he operated the marijuana grow for seven or eight months until he "got caught" on February 20, 2018.

Mike Wolff testified that there was an ongoing marijuana grow at Buford Court where electricity was not being paid for as of January 1, 2016, the farthest back he could review. Wolff opined that the marijuana grow was ongoing as of January 1, 2016, because "it's half way through a grow cycle on the first . . . ."

We conclude the trial court reasonably could have inferred that the power theft began when Torres commenced service on September 30, 2015, approximately three

15

months prior to January 1, 2016, by which time the power theft was already ongoing. Mike Wolff's testimony contradicted Torres's position that power diversion began in the summer of 2017. However, the trial court found Torres's testimony not "particularly credible." " 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.' " (*Regalado, supra*, 3 Cal.App.5th at p. 596.)

We conclude substantial evidence supports the trial court's determination that SMUD established with reasonable certainty that the power theft at Buford Court began when Torres commenced service on September 30, 2015.

E. *Buford Court–Amount of Damages*

Torres argues that the damages award as to Buford Court was not supported by substantial evidence because Mike Wolff's calculations, based on the inventory he prepared, assumed that all of the equipment inventoried was in use for the entire duration of the power theft. Torres argues there was no evidence to establish that he used all of the equipment found on February 20, 2018, at Buford Court from September 30, 2015, through February 20, 2018.

Mike Wolff prepared an inventory sheet of all the equipment that used the bypassed electrical circuit at Buford Court. He used that list to calculate the kilowatt hours of power that were not being paid for. The resulting 466 kWh per day discrepancy was in line with marijuana grows in houses of a similar size. Wolff testified, when discussing using the average daily bypass method used at Wheatland Drive, that billing from inventory is "the most accurate way that we can see, because [it's] based on the equipment that they're actually using and bypassing." Consistent with this testimony, in rejecting a defendant's contention that calculations supporting a restitution order were speculative, another panel of this court relied on, among other things, a SMUD investigator's testimony that "inventorying the equipment hooked up to power is the most accurate method for assessing power usage." (*People v. Phu* (2009) 179 Cal.App.4th

16

280, 285.)  Torres has not cited any authority for the proposition that this method of computing damages was insufficient, nor are we aware of any.

We conclude substantial evidence supports the trial court's determination that SMUD established the amount of damages at Buford Court with reasonable certainty.

### III

### *Punitive Damages*

Citing *Doe v. Lee* (2022) 79 Cal.App.5th 612, Torres argues that "an award of punitive damages was not appropriate given no evidence was presented as to his net worth."  SMUD responds that the punitive damages award was "functionally superfluous" based on the identical treble damages award and therefore any error was harmless.  We conclude the punitive damages award was not supported by substantial evidence and we therefore must vacate that award.

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."  (§ 3294, subd. (a).)  " 'Under California law, a punitive damages award must be based on three factors: (1) the reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded to or actual harm suffered by the plaintiff; and (3) the defendant's financial condition.' "  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 535; see *Adams v. Murakami* (1991) 54 Cal.3d 105, 110; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.)  The defendant's financial condition is relevant because "the function of deterrence [citation], will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.  [Citations.]"  (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928.)  It is the plaintiff's burden to demonstrate the defendant's financial condition.  (*Adams v. Murakami, supra*, 54 Cal.3d at p. 123; *Doe v. Lee, supra*, 79 Cal.App.5th at p. 623.)

17

" 'Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages.' " (*Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 647; see *Adams v. Murakami, supra*, 54 Cal.3d at p. 109 ["an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition"].) On appeal, we " 'examine the record to determine whether the challenged award rests upon substantial evidence. [Citations.] If it does not, and if the plaintiffs had a full and fair opportunity to make the requisite showing, the proper remedy is to reverse the award.' " (*Farmers & Merchants Trust Co. v. Vanetik, supra*, 33 Cal.App.5th at pp. 647-648.)

SMUD argued in the trial court that it had presented meaningful evidence of Torres's financial condition, emphasizing that Torres was "gainfully employed," worked as a truck driver for years, and owned the Wheatland Drive property. SMUD also presumed Torres profited from the marijuana grows. However, SMUD does not raise these arguments on appeal, and thus we may deem them abandoned. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal may be deemed waived].)

SMUD did not present meaningful evidence concerning Torres's financial condition at trial despite having the opportunity to do so and has abandoned its arguments in this court. As a result, the punitive damages award is not supported by substantial evidence and we shall vacate that award. Where, as here, a punitive damage award is vacated based on the insufficiency of the evidence, the plaintiff is not entitled to a retrial of the issue. (See *Doe v. Lee, supra*, 79 Cal.App.5th at p. 623.)

## DISPOSITION

The award of punitive damages is vacated. The judgment is otherwise affirmed. SMUD shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (5).)

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Mauro, Acting P. J.

_____\s\_____,
Mesiwala, J.

19