Filed 3/18/26 Certified for Publication 4/10/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LEONARDO CORDERO,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>GHILOTTI CONSTRUCTION COMPANY, INC.,<br><br>     Defendant and Respondent. | A173024<br><br>(San Mateo County Super. Ct. No. 22-Civ-03331) |

Plaintiff Leonardo Cordero, who worked for Camblin Steel Service, Inc. (Camblin), was injured while working on a pedestrian bridge project in Menlo Park. Ghilotti Construction Company, Inc. (Ghilotti) was the " 'turnkey' " contractor on the job.[1] Cordero sued Ghilotti for damages for his industrial injuries, and Ghilotti eventually moved for, and the trial court granted, summary judgment on the basis of the *Privette*[2] doctrine, which creates a "strong presumption under California law that a hirer of an independent

---

[1] The "general" contractor for the project was Level 10, which contracted with Ghilotti to, among other things, provide "all labor, material, equipment, detailing, and supervision required to design (where required), to procure, fabricate, furnish, deliver and install a fully functional MPK-22 Bridge." (Underscoring omitted.) Ghilotti subcontracted the rebar reinforcing work to Camblin.

[2] *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).

1

contractor delegates to the contractor all responsibility for workplace safety[,] . . . [which] means that a hirer is typically not liable for injuries sustained by an independent contractor or its workers while on the job." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 37–38 (*Gonzalez*).)

Cordero maintains the *Privette* presumption does not apply in this case and advances two arguments in this regard: First, as a matter of law, a Cal-OSHA (Lab. Code, § 6300 et seq.) regulation imposed a "nondelegable" duty on Ghilotti to address the site conditions that assertedly caused him to fall. Second, as a factual matter, Ghilotti did not delegate workplace safety to Camblin. He further maintains that even if the *Privette* presumption does apply, there are triable issues as to whether the "retained control" exception to the *Privette* doctrine set forth in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*) applies. We affirm.

## BACKGROUND

As the turnkey contractor for the bridge project, Ghilotti subcontracted various parts of the work. It contracted with Camblin to install the rebar reinforcement for the bridge support columns and abutments.[3]

Under its contract with Ghilotti, Camblin agreed it "shall be responsible to provide a safe work place for its employees," comply with all "OSHA or Cal/OSHA rules and regulations, applicable GCC safety procedures as provided, Senate Bill [No.] 198 (California), and any other subsequent related regulations," and comply with Ghilotti's own site-specific policies. It further agreed it had "fully acquainted itself with all obstructions, subsurface and other conditions relevant to the work, the site of the work and its surroundings, and assumes the risk of any variances between the actual

---

[3] Ghilotti engaged approximately 20 subcontractors to do different parts of the work.

2

conditions and the conditions shown or represented by the General Contract or this Subcontract; that it has made all investigations essential to a full understanding of the difficulties that may be encountered in performing the work; and that anything in the General Contract, this Subcontract, or any representations, statements or information made or furnished by [Ghilotti], or Owner notwithstanding, Subcontractor will . . . assume full and complete responsibility for all conditions relating to the work, the site of the work or its surroundings and all risks in connection therewith."

Ghilotti's superintendent on the project was responsible for scheduling Ghilotti's own work and that of subcontractors.[4]  In the mornings, Ghilotti personnel would generally walk through the site "to check the conditions" and determine which areas needed "to be covered in wood" for access and "cleaned" before subcontractors commenced their work.  The superintendent would direct the Ghilotti personnel "to prepare the work areas" where, for example, Camblin was going to work, instructing them to "make it safe for them to go to work."  It was also "on the subcontractor to make sure their employees [were] safe," and subcontractors could object if dissatisfied with the condition of the worksite.  If conditions degraded between the prep work by Ghilotti personnel and the time a subcontractor commenced work, it was expected the subcontractor would report the problem; otherwise, Ghilotti assumed access to the specific work area remained acceptable.

In late January 2021, Ghilotti's superintendent told Camblin it could start the rebar work on one of the columns (an area the parties refer to as "Bent 10") and "turned over to Camblin control of" that area of the site.

---

[4]  Ghilotti performed grading, excavating, backfilling, and carpentry work.

The morning Camblin was scheduled to commence work, Ghilotti's superintendent directed Ghilotti personnel to "dewater" the Bent 10 area. To do "dewatering," the Ghilotti crew would "open up" the silt fence on the slope at the specific work area, lay down planks to access the area that needed pumping, and pump the standing water. They "put the silt fence back" when they left. At the Bent 10 site, the dewatering crew pumped standing water, rinsed the footing, and cleaned all the mud around the footing. The crew left the planks laid on the slope to provide "safe access over the slope" to the work area.

Subsequently, Cordero and the other Camblin iron workers reported to the construction site and walked to the Bent 10 work area. Cordero saw and stepped in muddy areas, although exactly where is not clear from the record as the workers had to carry rebar from one area to the Bent 10 area. Cordero "really didn't pay attention" to the fact his boots had mud on them.

The Camblin workers constructed the initial rebar "cage" around the base of the column. To continue, they needed to climb up the rebar structure and install additional steel work at the top of the column. Cordero made the climb. But when he reached the top of the column, before he secured his positioning belt, one of his boots slipped and he fell. To assist Cordero in getting "out of the hole" he fell into, some "loose boards" were placed "around [the] column."

## DISCUSSION[5]

### *The* Privette *Doctrine*

In the "three decades since" our Supreme Court decided *Privette*, it has "repeatedly reaffirmed the basic rule that a hirer is typically not liable for

---

[5] Our standard of review is well established. "A trial court properly grants a motion for summary judgment only if no issues of triable fact appear

4

injuries sustained by an independent contractor or its workers while on the job." (*Gonzalez, supra*, 12 Cal.5th at p. 41.) This rule, commonly referred to as the *Privette* doctrine, applies to any person or entity in the hiring chain. (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 270, fn. 2 (*Sandoval*); *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 528 (*Tverberg I*).) Thus, an injured employee of an independent contractor typically cannot sue the contractor that let the subcontract. (*Tverberg I*, at p. 528.)

With respect to injured employees of independent contractors, the Supreme Court has grounded the *Privette* doctrine on the availability of workers' compensation. As the court explained in *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 598–599 (*SeaBright*), "[i]n light of [the workers' compensation] limitation on the independent contractor's liability to its injured employee, *Privette* concluded that it would be unfair to permit the injured employee to obtain full tort damages from the hirer of the independent contractor. That was especially so because (1) the hirer likely paid indirectly for the workers' compensation insurance as a component of the contract price [citation], (2) the hirer has no right to reimbursement from

---

and the moving party is entitled to judgment as a matter of law." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) On appeal from a judgment entered after the trial court has granted a motion for summary judgment, we examine the record de novo. (*Ibid.*) We must liberally construe the evidence in support of the party opposing summary judgment and resolve any doubts concerning the evidence in favor of that party. (*Ibid.*) The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) If the moving party carries this burden, the burden shifts, and the opposing party has the burden of showing a triable issue of material fact. (*Ibid.*) The opposing party must make a prima facie showing sufficient to support its position. (*Ibid.*)

the contractor even if the latter was primarily at fault [citations], and (3) those workers who happen to work for an independent contractor should not enjoy a tort damages windfall that is unavailable to other workers [citation]."

As the high court subsequently observed in *Gonzalez, supra*, 12 Cal.5th at page 41, its more recent cases "emphasize delegation as the key principle underlying [the *Privette* doctrine]: Because the hirer presumptively delegates to the independent contractor the authority to determine the manner in which the work is to be performed, the contractor also assumes the responsibility to ensure that the worksite is safe, and the work is performed safely."

This "presumptive delegation" of the duty to provide a safe workplace (*Sandoval, supra*, 12 Cal.5th at p. 271) insulates all those in the hiring chain from tort liability for workplace injuries suffered by an independent contractor or an employee thereof or consultant thereto. (*Id.* at p. 270 & fn. 2; *Tverberg I, supra*, 49 Cal.4th at p. 528.)

The court has identified only "two limited circumstances" in which the *Privette* presumption of delegation is overcome. (*Gonzalez, supra*, 12 Cal.5th at p. 38.) The exception relevant here is that articulated in *Hooker*, wherein the court "held that a hirer will be liable where it exercises retained control over any part of the contractor's work in a manner that affirmatively contributes to the worker's injuries."[6] (*Gonzalez*, at p. 42.)

---

[6] "The second exception was recognized in *Kinsman*[*v. Unocal Corp.* (2005)] 37 Cal.4th 659 and is usually referred to as the *concealed hazard exception*. It applies if the hirer is also an owner or possessor of land, and if 'the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this hazardous condition, and the landowner failed to warn the contractor about this condition.' (*Id.* at p. 664, fn. omitted.) Under this exception, the hirer's delegation of tort duties can be

6

However, retained control over conditions at the worksite, in and of itself, is insufficient to preclude the application of *Privette*. (*Gonzalez, supra*, 12 Cal.5th at p. 42.) "[U]nless a landowner retains control over any part of the contractor's work and negligently exercises that retained control in a manner that affirmatively contributes to the injury [citation], it will not be liable to an independent contractor or its workers. . . ." (*Id.* at pp. 38–39; see *Sandoval, supra*, 12 Cal.5th at pp. 274–279 [discussing *Hooker* exception in detail]; *McCullar v. SMC Contracting, Inc.* (2022) 83 Cal.App.5th 1005, 1013–1015 (*McCullar*).)

Thus, "this exception to *Privette* is not met solely because a hirer is aware that there is an unsafe condition on the worksite or knows that the contractor is engaging in an unsafe work practice. [Citation.] Something more is required, such as ' "inducing injurious action or inaction through actual direction" ' [citation]; directing ' "the contracted work be done by use of a certain mode" ' [citation]; or interfering with ' "the means and methods by which the work is to be accomplished." ' " (*Gonzalez, supra*, 12 Cal.5th at p. 42; see *Sandoval, supra*, 12 Cal.5th at p. 276 ["Contract workers must prove that the hirer *both* retained control [of the contracted work] *and* actually exercised that retained control in such a way as to affirmatively contribute to the injury."]; *McCullar, supra*, 83 Cal.App.5th at pp. 1014–1015;

---

seen as 'ineffective' because the independent contractor cannot protect its workers against a hazard it does not know about and could not reasonably discover. (*Sandoval, supra*, 12 Cal.5th at p. 271.)" (*Miller v. Roseville Lodge No. 1293, Loyal Order of Moose, Inc.* (2022) 83 Cal.App.5th 825, 834 (*Miller*).) The courts sometimes refer to a "third" exception—where the contractor provides and requires the use of unsafe or defective equipment. (See *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225–226.) But this "exception" plainly comes within the ambit of the "retained control" exception.

*Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 641 (*Alvarez*).) " ' "[P]assively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution." ' " (*Bowen v. Burns & McDonnell Engineering Co., Inc.* (2024) 103 Cal.App.5th 759, 765 (*Bowen*), quoting *Degala v. John Stewart Co.* (2023) 88 Cal.App.5th 158, 170.) "[F]or the retained control exception to apply, there must be . . . some indication the hirer *directed* that the contractor perform its work in a certain way or *interfered* with the means and methods by which the work was to be accomplished." (*Bowen,* at p. 765.)

Thus, as the Supreme Court has stated, this exception applies in "limited circumstances." (*Sandoval, supra*, 12 Cal.5th at pp. 278–279.) *Sandoval* is illustrative. In that case, the employee of an electrical parts specialist suffered severe burns when he triggered an arc flash from a circuit he did not realize was live with flowing electricity. (*Id.* at p. 264.) The question before the court was whether the company that owned the premises, operated the electrical equipment, and hired the contractor, could be liable for the employee's injuries. (*Ibid.*) The answer, said the court, was "no," specifically rejecting the employee's argument that because the company was in charge of "the power-down process" the retained control exception applied. (*Id.* at pp. 274, 279.)

A hirer retains control for purposes of the *Hooker* exception, said the high court, where it "retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor." (*Sandoval, supra*, 12 Cal.5th at p. 274.) However, such authority "amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner." (*Id.* at p. 275.) Thus, while the parties disputed whether the

8

owner/hirer retained control " 'over safety conditions at the worksite,' " the court clarified that was *not* the question—rather, the "pivotal question . . . [was] whether the hirer retained a sufficient degree of control over the manner of performing the contracted work." (*Ibid.*)

Moreover, even where the "sufficient degree of control" over the "*manner of performing the contracted work*" predicate is met, "hirers owe the contract workers a retained control duty only with something more." (*Sandoval, supra*, 12 Cal.5th at p. 276, italics added.)  A worker must prove "the hirer *both* retained control *and* actually exercised that retained control in such a way as to affirmatively contribute to the injury."  (*Ibid.*) " 'Affirmative contribution' means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury."  (*Id.* at p. 277.)  This "requirement can be satisfied only if the hirer in some respect induced—not just failed to prevent—the contractor's injury-causing conduct."  (*Ibid.*; see *Bowen, supra,* 103 Cal.App.5th at p. 767 [*Privette* applied where subcontractor employee did "not present any evidence that [general contractor] directed that he perform his work in a certain way or that it interfered with the means by which he was to accomplish his work"].)  Thus, "[a] hirer's mere authority to prevent or correct a contractor's unsafe practices (retained control) does not, without more, limit the contractor's delegated control over the work."  (*Sandoval,* at p. 278.)

Accordingly, in *Sandoval* the owner/hirer was not liable for the employee's injuries.  The owner/hirer's "control over the power-down process was not 'retained control' over contracted work, because the power-down process was not within the scope of work that [the hirer] had entrusted to [the contractor]."  (*Sandoval, supra*, 12 Cal.5th at p. 279.)  Although the

9

owner/hirer "may have had authority—by virtue of performing the power-down process or otherwise—to require specific precautions during the inspection . . . [it] did not 'actually exercise' that authority." (*Id.* at p. 280.) "By turning over control of the worksite, [the hirer] presumptively delegated to [the contractor] any preexisting duties [the hirer] otherwise owed [the contractor's employee]." (*Id.* at p. 281)

The court's other recent decision in *Gonzalez* is especially illuminating. In that case, an independent contractor hired to clean skylights on a homeowner's roof slipped and fell on an allegedly unsafe, poorly maintained part of the roof. (*Gonzalez, supra*, 12 Cal.5th at pp. 39–40.) The owner clearly "retained control" of the roof but that was immaterial, as workplace safety had presumptively been delegated to the contractor. It was therefore the contractor's responsibility to either determine how to safely perform the work for which it had been hired in light of the hazardous condition of the roof, or to refuse to do the work. (*Id.* at pp. 51–52, 54.)

The high court rejected the contractor's argument that the homeowner had never delegated to it the owner's "duty to maintain the roof in a reasonably safe condition." (*Gonzalez, supra*, 12 Cal.5th at p. 54.) The court explained that "while [the owner] may not have delegated any duty to repair the roof or make other structural changes to it, [the owner] did delegate to [the independent contractor] a duty to provide a safe workplace to his workers and to perform the work for which he was retained in a safe manner. This encompassed a duty on [the contractor's] part to assess whether he and his workers could clean the skylight safely despite the existence of the known hazardous conditions on the roof." (*Ibid.*; see *Gravelin v. Satterfield* (2011) 200 Cal.App.4th 1209, 1211–1213 [employee of contractor hired by satellite company to install satellite dish fell while attempting to climb onto roof via

10

an unsupported roof extension that collapsed; although the property owner clearly retained control of the roof and roof extension, it was the contractor's responsibility to determine how to safely do the contracted work].)

*Brannan v. Lathrop Constr. Associates, Inc.* (2012) 206 Cal.App.4th 1170 (*Brannon*) provides another example.  In that case, the hirer scheduled work at the project site in a way that resulted in a plaster subcontractor's scaffolding being left in an area where a masonry subcontractor had to work. (*Id*. at pp. 1173–1174.)  The masonry subcontractor asked the general contractor when the plaster scaffold would be removed but otherwise believed its crews could work around the scaffold.  (*Id*. at p. 1174.)  One rainy day, one of the masonry subcontractor's employees slipped and fell when he tried to cross over the scaffold to lay masonry in an area underneath it.  (*Ibid*.)  No one told the employee to take this route, but he believed crossing through the scaffold was the only way to access his work area.  (*Ibid*.)  The employee sued the general contractor who successfully moved for summary judgment.  (*Id*. at p. 1173.)

The Court of Appeal affirmed.  (*Brannan, supra*, 206 Cal.App.4th at p. 1173.)  Although the employee claimed he was left with no option but to climb over the scaffolding, the general contractor did not direct the employee's work or tell him to gain access in that manner.  (*Id*. at pp. 1178–1179.)  The court observed it would have been a "different case" had the masonry subcontractor asked that the scaffolding be removed for safety, the general contractor had promised to do so, and then negligently failed to follow through.  As it was, however, the general contractor allowing the scaffold to remain in place while the masonry work proceeded was not an exercise of retained control over safety.  (*Id*. at p. 1180; see *Horne v. Ahern Rentals, Inc.* (2020) 50 Cal.App.5th 192, 203 (*Horne*) [affirming summary judgment and

11

commenting "[t]his . . . would be a different case if [the contractor] or one of its employees had asked defendant to take safety measures to be sure the forklift was stable, and defendant promised to do so, but did not follow through"].)

### *The* Privette *Presumption Applies*

In *Alvarez,* the Court of Appeal cogently explained how the *Privette* doctrine affects the parties' respective burdens on a motion for summary judgment. It pointed first to the Supreme Court's holding that the "*Privette* line of decisions establishes a presumption that an independent contractor's hirer 'delegates to that contractor its tort law duty to provide a safe workplace for the contractor's employees,' " calling this the "*Privette* presumption." (*Alvarez, supra*, 13 Cal.App.5th at p. 642, quoting *SeaBright, supra*, 52 Cal.4th at p. 600; *Sandoval, supra*, 12 Cal.5th at p. 269 ["[w]hen a person or organization hires an independent contractor, the hirer *presumptively delegates* to the contractor the responsibility to do the work safely," italics added].) This presumption, the appellate court explained, arises once the defendant establishes the requisite factual foundation— namely, that it hired an independent contractor to perform certain work, and the independent contractor's worker was injured in the course of that work. (*Alvarez,* at p. 644.) If this showing is made, the burden then shifts to the plaintiff to raise a triable issue as to whether one of the exceptions to the *Privette* doctrine applies, and if the plaintiff does not meet that burden, the defendant is entitled to summary judgment. (*Ibid*.)

The trial court concluded Ghilotti established the requisite factual foundation triggering the *Privette* presumption and therefore the burden shifted to Cordero to raise a triable issue that an exception to the *Privette* doctrine applies.

Cordero maintains the court erred and no evidentiary burden shifted to him. He does not dispute that he worked for Camblin, the independent contractor Ghilotti hired to do the steel reinforcing work on the bridge columns. Nor does he dispute that he was injured while performing that work. Rather, he maintains Ghilotti owed him a nondelegable regulatory duty under Cal-OSHA regulations (specifically Cal. Code Regs., tit. 8, § 1711 ("section 1711")[7]) and, in any case, assumed by its actions, the duty to provide safe access to the worksite.

### Cal-OSHA Regulation

In *SeaBright,* our Supreme Court addressed, and rejected, the argument Cordero advances here—that for purposes of *Privette,* Cal-OSHA regulations impose "nondelegable" workplace safety obligations on those hiring subcontractors. In that case, the defendant airline hired an independent contractor to maintain and repair a conveyor used to move luggage at an airport. While an employee of the contractor was inspecting the conveyor, his arm got caught in its moving parts. The employee sued the airline for damages. The airline subsequently moved for summary judgment under *Privette* and *Hooker,* arguing it was not liable for the employee's injuries as it did not retain control over the contractor's work and did not exercise any control it did retain in a way that affirmatively contributed to the employee's injuries. The employee opposed the motion on the ground the conveyor lacked safety guards in violation of Cal-OSHA regulations, and safety guards would have prevented his injuries. The trial court granted the motion. The Court of Appeal reversed, holding that, under the Cal-OSHA

---

[7] Section 1711 is a Construction Safety Order issued by the Department of Industrial Relations, Occupational Safety and Health Standards Board.

13

regulations, the airline had a nondelegable duty to ensure that the conveyor had safety guards and there was a triable issue of fact as to whether the airline's failure to perform this duty affirmatively contributed to the employee's injuries.  (*SeaBright, supra*, 52 Cal.4th at pp. 594–595.)

The high court reversed, holding the airline "presumptively delegated to [the independent contractor] any tort law duty of care the airline had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of [the independent contractor's] employees.  The delegation . . . included a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard." (*SeaBright, supra*, 52 Cal.4th at p. 601.)

The court explained, "After our 2002 decision in *Hooker, supra,* 27 Cal.4th 198 (in which we allowed actions in tort against an independent contractor's hirer if the hirer retained control over the work and exercised that control negligently, thereby affirmatively contributing to the worker's injury), several Courts of Appeal . . . concluded that the hirer's statutory or regulatory duties constitute retained control if those duties are nondelegable.  The courts disagree[d], however, about the effect of a breach.  Some courts . . . held that the breach of a nondelegable statutory or regulatory duty can, by itself, create a triable issue as to whether the hirer '*affirmatively* contributed' (*Hooker,* at p. 210) to the injury of the independent contractor's employee. [Citations.]  Other courts . . .  held that if the breach is merely an omission, that breach alone cannot qualify as the 'affirmative[] contribut[ion]' required for liability under *Hooker*. . . .  [Citations.] [¶] These cases are inapposite here because we reject the premise that the tort law duty, if any, that a hirer owes under Cal-OSHA and its regulations to the employees of an independent contractor is nondelegable.  When in this case defendant US Airways hired

14

independent contractor Aubry to maintain and repair the conveyor, US Airways presumptively delegated to Aubry any tort law duty of care the airline had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of Aubry's employees.  The delegation—which . . . is implied as an incident of an independent contractor's hiring—included a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard." (*SeaBright, supra,* 52 Cal.4th at p. 601.)

In sum, the "delegation" which is presumed as a threshold matter under *Privette* encompasses not only contractually based workplace safety duties, but also those imposed by regulatory provisions.  (See *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1090 (*Delgadillo*) [even assuming owner failed to equip its commercial building with roof anchors as required by Cal-OSHA regulations, *Privette* doctrine applied].)

Cordero insists that is not the case, citing to the Supreme Court's decision in *Elsner v. Uveges* (2004) 34 Cal.4th 915 (*Elsner*).  The plaintiff in *Elsner* was an employee of a roofing contractor who was injured when a scaffolding collapsed.  The temporary scaffolding, which did not meet Cal-OSHA regulations, had been constructed by a carpenter who was also on the job.  The plaintiff sued the general contractor, asserting causes of action for negligence, premises liability, breach of nondelegable duty, failure to provide a safe place of work, and peculiar risk.  (*Id.* at p. 924.)  The trial court allowed evidence of the Cal-OSHA violation.  The Court of Appeal reversed.  The high court affirmed the judgment given the statutory prohibition of such evidence applicable at the time of trial.  However, it went on to explain that amendments to the statute had since made evidence of Cal-OSHA violations permissible "to establish a standard or duty of care in all negligence and

15

wrongful death actions, including third party actions." (*Id.* at pp. 926, 928; *id.* at pp. 935–936 [amendment revisited "the rules for the admissibility of Cal-OSHA provisions in trial court personal injury and wrongful death actions," and "[i]n general, plaintiffs may use Cal-OSHA provisions to show a duty or standard of care to the same extent as any other regulation or statute, whether the defendant is their employer or a third party].)

While the high court's 2004 decision in *Elsner* may have involved an action by an injured employee of a subcontractor against a general contractor, no issue concerning *Privette* was raised or addressed by the court. It is well established that a case is not authority for a proposition that is not raised or addressed. (See *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [" ' "cases are not authority for propositions not considered" ' "].)

In any case, more than a decade after *Elsner,* the Supreme Court squarely addressed in its 2011 decision in *SeaBright* whether Cal-OSHA regulations create "nondelegable" duties for purposes of *Privette* that pave the way for an employee of an independent contractor to sue a contractor in the hiring chain for an industrial injury. Indeed, the Supreme Court expressly stated in *SeaBright* that "conflicting views" had developed "among the Courts of Appeal as to how our holdings in *Privette*, *supra*, 5 Cal.4th 689, and *Hooker*, *supra*, 27 Cal.4th 198, apply when the hirer of the independent contractor has failed to comply with Cal-OSHA regulations," and the court granted review "[t]o resolve the conflict in the Courts of Appeal." (*SeaBright*, *supra,* 52 Cal.4th at p. 595.)

Cordero nevertheless argues *SeaBright* does not apply to the regulation on which he relies—a Construction Safety Order issued by the Occupational Safety and Health Standards Board pertaining to "Reinforcing Steel and Post-Tensioning in Concrete Work." (§ 1711.) The regulatory order expressly

16

applies to a specific class of ironworkers—those "associated with the use of reinforcing steel assemblies used in the construction of concrete and masonry structures including post-tensioning operations." (*Id.*, subd. (a)(1).) This regulation provides, in part, that a "Controlling Contractor"—defined as "[a] prime contractor, general contractor, construction manager, or any other legal entity that has the overall responsibility for the construction of the project, including planning, quality, and completion"—as to "Site Access and Layout" "shall ensure that the following is provided and maintained: [¶] (1) Adequate access roads into and through the site for the safe delivery and movement of derricks, cranes, trucks, other necessary equipment, the material to be erected, and the means and methods for pedestrian and vehicular control. . . . [¶] (2) . . . [A] firm, properly graded, and drained area, that is readily accessible to the work with adequate space for the safe assembly, rigging, and storage of reinforcing and post-tensioning material, and the safe operation of the reinforcing contractor's equipment." (*Id.,* subds. (b) & (c)(1)–(2).)

Cordero points to a footnote in *SeaBright* wherein the high court stated, "Not present here is a situation in which the relevant statutes or regulations indicate an intent to limit the application of *Privette* . . . , or preclude delegation of the tort law duty, if any, that the hirer owes to the contractor's employees." (*SeaBright, supra,* 52 Cal.4th at p. 594, fn. 1.) He maintains the "regulatory history" of section 1711 shows such intent, observing that *SeaBright* was decided in 2011 and section 1711 was updated in 2017.

Even assuming a regulatory body such as the Occupational Safety and Health Standards Board can effectively abrogate Supreme Court precedent as to a specific class of ironworkers, as Cordero claims, it is well established

17

that subsequent legislation will not be interpreted as repealing existing precedent unless such intent is clearly expressed. (See *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 669 ["statutes generally should not be construed to alter or abrogate the common law . . . a legislative purpose to do so must clearly and unequivocally appear"].) Nothing in the language of section 1711 remotely suggests the Board updated it to carve out an exception from *SeaBright* for ironworkers involved with "the use of reinforcing steel assemblies used in the construction of concrete and masonry structures including post-tensioning operations." (§ 1711, subd. (a)(1).) Nor is there any such suggestion in the secondary materials Cordero references— specifically, the Board's notice of hearing and its final statement of reasons for the proposed update.[8]

Accordingly, section 1711 does not fall within *SeaBright's* footnote suggesting there could be a statutory or regulatory exception to its holding.

We therefore need not consider Cordero's additional argument, predicated on footnote 1, that *Delgadillo, supra,* 20 Cal.App.5th 1078, is

---

[8] The notice stated the proposed updates were "intended to reduce material handling related accidents due to site conditions, structural collapse of vertical formwork and decks, collapse of vertical and horizontal columns due to improper or faulty guying and bracing, insufficient, cramped working spaces and platforms from which to position heavy equipment, impalement, and post-tensioning accidents in post-tensioning operations attributable to lack of training." The notice went on to say the proposed language "consist[ed] largely of consensus document-based regulatory text specifically addressing post-tensioning operations in greater detail than that addressed by Federal OSHA in its 29 CFR 1926.701(c) standards which consist of minimal provisions similar to those contained in CSO Section 1721. The proposal contains a list of defined terms . . . not addressed by [then] current federal OSHA standards, more detailed post-tensioning specific site access requirements, written notification before commencing work provisions, placement of support system design responsibility upon the controlling contractor (CC), and expanded rebar impalement protection."

distinguishable because the window washing regulation at issue in that case (Cal. Code Regs., tit 8, § 3283) did not specifically allocate safety tasks to a "controlling contractor" but only directed that roof "anchors" be installed for the safety of window washers. It is clear from the substance of the regulation at issue in *Delgadillo,* however, that the duty to supply anchors falls not on the worker but on the owner of the building. (See *id.*, § 3283, subds. (b) [anchor design], (c) [anchor location], (d) [anchor installation].)

Moreover, in *Gonzalez,* the Supreme Court provided the following summary of *Delgadillo*: There, "an employee of an independent contractor fell to his death while he was washing a commercial building's windows when his descent apparatus detached from the roof. [Citation.] The plaintiffs submitted evidence that (1) the building's owners had a statutory and regulatory duty to provide approved anchor points on the roof to support window washers; (2) the building contained no such anchor points; and (3) without the anchor points, there was no safe way to clean the windows. [Citation.] The court nevertheless determined that the landowners owed no duty because, under our holding in *SeaBright*, they delegated to the contractor the duty to comply with all statutory and regulatory requirements necessary to provide a safe workplace. [Citation.] The court also found that the owners did not exercise retained control over the contractor's work in a manner that affirmatively contributed to the injury because, while the building had inadequate anchor points, the owners did not 'suggest or request' that the contractor use them in cleaning the windows. [Citation.] Like *SeaBright*, *Delgadillo* illustrates that even where an unsafe condition exists on the premises due to the landowner's failure to comply with specific statutory and regulatory duties, the landowner is not liable because it is the

19

contractor who is responsible for its own workers' safety." (*Gonzalez, supra*, 12 Cal.5th at p. 48.)

### *Factual Non-Delegation*

Cordero additionally maintains that as a factual matter Ghilotti did not delegate workplace safety to Camblin. He points, for example, to evidence we have recited—that Ghilotti's contract with the general contractor required it provide safe working conditions, Ghilotti, itself, performed grading, paving, backfill, and concrete work, Ghilotti personnel typically inspected the construction site in the mornings to check on conditions, Ghilotti personnel would "dewater" specific work areas and did so at the Bent 10 work area, and subcontractors were told to contact Ghilotti about problems with site conditions. However, this argument misperceives the distinction between the "requisite factual foundation" a defendant must establish to trigger the *Privette* presumption, and the burden that may thereafter shift to the plaintiff to raise a triable issue that an exception to the *Privette* doctrine applies.

As we have recited, well established case law holds that the *Privette* presumption arises where the defendant has hired an independent contractor to perform certain work, and the independent contractor's worker was injured in the course of that work. (*Alvarez, supra*, 13 Cal.App.5th at p. 644; accord, *Bowen, supra,* 103 Cal.App.5th at p. 766; *Miller, supra,* 83 Cal.App.5th at p. 834.) The evidence is uncontradicted that Ghilotti hired Camblin Steel, an independent subcontractor, to perform the rebar reinforcing work, that Cordero was an employee of Camblin, and that he was injured while performing the work Camblin was hired to do.

In short, the evidence Cordero recites in support of his argument that the burden did not shift to him pertains not to whether the *Privette*

20

presumption applies, but to whether he carried his burden of raising a triable issue that an exception to the *Privette* doctrine applies.

### The "Retained Control" Exception Does Not Apply

Cordero additionally maintains that even if the *Privette* presumption applies, he presented evidence raising a triable issue that the "retained control" exception to the *Privette* doctrine applies. This evidence is largely the deposition testimony of Jimmy Smith, who testified about "dewatering" specific work areas when it was rainy and a subcontractor was expected to commence work in those areas, such as at Bent 10. As we have recited, depending on the weather, the Ghilotti superintendent would direct Smith and several co-workers to dewater a specific area. Smith and his co-workers, in turn, would "open up" the silt fence on the slope of the work area, lay down planks to access the area that needed pumping, pump the standing water, and "put the silt fence back" when they left. The crew left the planks laid on the slope to provide "safe" access "over the slope" to the work area. Cordero asserts this evidence establishes that Ghilotti both "retained" control of worksite safety with respect to wet conditions and "exercised" such control.

As we have discussed, the "retained control" exception set forth in *Hooker* and its progeny applies only "if: (1) the hirer retains control over the manner in which the contractor performs the work; (2) the hirer actually exercises its retained control by involving itself in the work such that the contractor is not entirely free to do the work in its own manner; and (3) the hirer's exercise of retained control affirmatively contributes to the worker's injury." (*Miller, supra,* 83 Cal.App.5th at p. 833.) Stated another way, "for the retained control exception to apply, there must be . . . some indication the hirer *directed* that the contractor perform its work in a certain way or

21

*interfered* with the means and methods by which the work was to be accomplished." (*Bowen, supra,* 103 Cal.App.5th at p. 765.)

There is no evidence Ghilotti retained control over how Camblin performed the steel reinforcing work it was hired to do. Or stated another way, there is no evidence Ghilotti "*directed* that [Camblin] perform its [rebar reinforcing] work in a certain way or *interfered* with the means and methods by which the [rebar reinforcing] work was to be accomplished" (*Bowen, supra,* 103 Cal.App.5th at p. 765), precluding Camblin from carrying out the duties presumptively delegated to it to ensure the safety of its workers.

Even if Ghilotti personnel did not do an adequate job of dewatering the Bent 10 site, as Cordero claims, that does not render *Privette* inapplicable. As the Supreme Court stated in *Sandoval*, a hirer "might be responsible for the presence of a hazard . . . and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit." (*Sandoval, supra,* 12 Cal.5th at p. 276; see *SeaBright, supra,* 52 Cal.4th at pp. 594, 601 [even if airline failed to install "certain safety guards [on the conveyor] required by applicable [Cal-OSHA] regulations," it was nonetheless the contractor's "duty to identify the absence of the safety guards . . . and to take reasonable steps to address that hazard"]; *Gonzalez, supra,* 12 Cal.5th at p. 54 [even though owner had allowed roof to become hazardous in some areas, it was the contractor's duty to provide a safe workplace for his employees; therefore, it was up to the contractor to assess whether he and his workers could safely clean a skylight despite the hazardous conditions on the roof and, if not, to refuse to perform the work]; *McCullar, supra,* 83 Cal.App.5th at p. 1018 [even though hirer's own use of heaters caused floor to ice over, hirer "did not interfere with or otherwise impact [the contractor's] decisions on how to safely perform his work].)

22

Thus, in *Gonzalez,* the high court provided the following illustrative list of "situations in which courts have concluded retained control was actually exercised, including 'directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; requesting the contractor to use the hirer's own defective equipment in performing the work; contractually prohibiting the contractor from implementing a necessary safety precaution; or reneging on a promise to remedy a known hazard.' " (*CBRE v. Superior Court* (2024) 102 Cal.App.5th 639, 652, quoting *Gonzalez, supra,* 12 Cal.5th at p. 47.)

Cordero relies on *Tverberg v. Fillner Construction, Inc.* (2012) 202 Cal.App.4th 1439 (*Tverberg II*) in which an independent contractor (an individual person) hired to be the foreperson of a crew of one of the sub-subcontractors, was injured by work performed by another subcontractor. The independent contractor sued the general contractor. (*Id.* at pp. 1442–1443.) The trial court granted summary judgment, ruling the independent contractor could not hold the general contractor vicariously liable on a peculiar risk theory or directly liable for failing to cover bollard holes drilled by the other subcontractor immediately adjacent to where the independent contractor was working. (*Id.* at pp. 1443–1444.) The Court of Appeal reversed as to the peculiar risk theory and did not reach the direct liability claim. The Supreme Court granted review and reversed and remanded for reconsideration of the direct liability claim. (*Id.* at p. 1444.) The Court of Appeal ruled the contractor could proceed. Since *SeaBright* was then pending, the Supreme Court granted review again, and on issuing its decision in that case, reversed and remanded *Tverberg* a second time. (*Ibid.*)

The Court of Appeal ruled the independent contractor could not base a claim on any alleged nondelegable duty (*Tverberg II, supra,* 202 Cal.App.4th at p. 1445) but had presented enough evidence to raise a triable issue of retained control. The appellate court identified a constellation of factors: One, "by ordering these holes to be created and requiring [the independent contractor] to conduct unrelated work near them, [the general contractor's] conduct may have constituted a negligent exercise of its retained control in a manner that could have made an affirmative contribution to [the independent contractor's] injury." (*Id.* at p. 1448.) Two, the general contractor's "employee in charge of the jobsite testified that he concluded that the stakes and safety ribbon that were provided constituted sufficient worker protection." (*Ibid.*) Three, the general contractor "failed to cover the holes after [the independent contractor] twice asked [it] to do so" and initially stated the "equipment necessary to comply with this request was not available," suggesting the general contractor "agreed to undertake a safety measure and did not do so." (*Ibid.*)

The Courts of Appeal have since emphasized the multiplicity of factors in *Tverberg II* and particularly the point that there was evidence the general contractor promised the independent contractor to take a specific action to address an obvious hazard and failed to do so. (See *Bowen, supra,* 103 Cal.App.5th at pp. 765, 768–770 [distinguishing *Tverberg II;* there must be "some indication the hirer *directed* that the contractor perform its work in a certain way or *interfered* with the means and methods by which the work was to be accomplished" or "promise[d] to undertake a particular safety measure and negligently fail[ed] to do so; "contractual responsibility for the safety of its subcontractors" is not sufficient]; *Horne, supra,* 50 Cal.App.5th at p. 201 [distinguishing *Tverberg II;* hirer may be liable for injury to an

24

employee of an independent contractor only if hirer "actively directs the contractor or contractor's employee to do the work in a particular way or fails to undertake a particular safety measure the hirer promised to do"]; *McCullar, supra,* 83 Cal.App.5th at pp. 1022–1023 [distinguishing *Tverberg II* and questioning its consistency with *SeaBright* and *Gonzalez;* while subcontractor "fairly conveyed the message that he preferred [the contractor] to deal with the ice" issue, he did not convey the message that " 'he could not safely perform the work of laying pipes . . . and that he had no way of clearing the ice' "]; *Khosh v. Staples Construction Co., Inc.* (2016) 4 Cal.App.5th 712, 719 [distinguishing *Tverberg II*; no triable issue where there was no evidence the owner "refused a request to shut off electrical power or prevented [the independent contractor] from waiting until the scheduled shutdown before starting work"; a general promise to be " 'responsible for site safety' " does not constitute a specific promise to undertake a particular safety measure"].)

Simply put, "a hirer does not exercise retained control over the contractor's work in a manner that affirmatively contributes to the contractor's [employee's] injury by merely permitting or failing to correct an unsafe work condition." (*Gonzalez, supra,* 12 Cal.5th at p. 55; see *Hooker, supra,* 27 Cal.4th at pp. 214–215.) But that is the most that can be said about the showing Cordero made here and, as many cases have now held, such a limited showing does not suffice for purposes of the "retained control" exception to the *Privette* doctrine. Because this deficit in Cordero's showing is dispositive, we need not, and do not, consider any other arguments advanced by the parties pertaining to the "retained control" exception.[9]

---

[9] We also need not, and do not, separately address the trial court's order denying Cordero's motion for new trial, as it advanced only arguments that the trial court had erred as a matter of law in granting summary judgment. Because we have concluded the court did not err in that regard, it

25

**DISPOSITION**

The judgment is AFFIRMED.  Respondent to recover costs on appeal.

---

necessarily follows the court did not err or abuse its discretion in denying a new trial.

_____

Banke, J.

We concur:


_____

Humes, P. J.


_____

Smiley, J.


A173024, Cordero v. Ghilotti Construction Co., Inc.

Filed 4/10/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LEONARDO CORDERO,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>GHILOTTI CONSTRUCTION COMPANY, INC.,<br><br>    Defendant and Respondent. | A173024<br><br>(San Mateo County Super. Ct. No. 22-Civ-03331)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on March 18, 2026, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.


Dated: _____

                                                  P. J.

Trial Court:San Mateo County Superior Court

Trial Judge:        Hon. Nancy Fineman

Counsel:
The Arns Davis Law Firm, Juan C. Flores, Jonathan E. Davis and Shounak
S. Dharap for Plaintiff and Appellant.

Yukevich Cavanaugh, Hassan Elrakabawy, James J. Yukevich and Nicole
Guillen for Defendant and Respondent.